**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| IN THE INTEREST OF: J.B. | : | No. 31 WAP 2017 |
| | : | |
| | : | Appeal from the Order of the Superior |
| APPEAL OF: J.B. | : | Court entered September 1, 2016 at No. |
| | : | 980 WDA 2015, affirming the Order of |
| | : | the Court of Common Pleas of |
| | : | Lawrence County entered May 18, 2012 |
| | : | at No. 113 of 2011, JUV. |
| | : | |
| | : | ARGUED: November 29, 2017 |


**OPINION**


**JUSTICE TODD**                    **DECIDED:  JULY 18, 2018**

J.B., a juvenile, appeals from the Superior Court's order affirming the dispositional order of the juvenile court entered after its adjudication of J.B. delinquent of the offenses of first-degree murder and homicide of an unborn child in connection with the shooting death of his stepmother inside their family home on the morning of February 20, 2009.  J.B. asserts that there was insufficient evidence to support his adjudication of delinquency beyond a reasonable doubt for these offenses, and, alternatively, that the juvenile court's adjudication was against the weight of the evidence.  Our careful review of the evidentiary record in this matter compels our conclusion that the evidence introduced at his adjudicatory hearing was insufficient, as a matter of law, to establish his delinquency for these offenses beyond a reasonable doubt.  As a result, we are obligated to reverse the Superior Court's order which affirmed the juvenile court's order of disposition for these offenses.

## I. Factual Background

In our prior opinion in this matter, *In re J.B.*, 106 A.3d 76 (Pa. 2014) ("*In re J.B. II*"), we recounted the factual circumstances surrounding the criminal offenses for which J.B. was adjudicated delinquent. As these facts must be scrutinized as part of our consideration of J.B.'s present claims, we set forth those facts from that opinion in full:

> During February 2009, C.B. (an adult male), along with his fiancée — K.M.H ("the victim") — her two daughters, J.H. (age 7) and A.H. (age 4), and C.B.'s 11-year-old son J.B. were living together in a two-story rented house. The house was located in a rural area surrounded by farmland and woods, and situated near the town of Wampum, Pennsylvania. During the predawn hours on the morning of Friday, February 20, 2009, C.B. left the house to go to work. According to C.B., it had snowed overnight, and at the time he was leaving — 6:45 a.m. — there was snow on the ground. N.T. Adjudication Hearing, 4/11/12, at 147. C.B. recalled that he departed in his usual fashion by backing his vehicle out of a parking area adjoining the rear of the house and onto the long driveway which led from a combination storage barn and garage complex ("garage") located behind the house to the nearby thoroughfare of Wampum-New Galilee Road ("road").[1] He arrived at work approximately fifteen minutes later at around 7:00 a.m. *Id.* at 146.
>
> Later that morning, J.B. came downstairs from his upstairs bedroom in the house to get dressed for school. *Id.* at 68. During this period of time, C.B. and the victim — who was then over 8 months' pregnant — had been in the process of relocating the contents of their shared bedroom on the first floor of their home to J.B.'s upstairs bedroom, attached to which was another smaller bedroom they had previously converted into a nursery for use once their baby was born. N.T. Adjudication Hearing, 4/10/12, at 108; 4/11/12, at 68-69. This shared bedroom was located in the front of the house directly to the right of the front door. N.T. Adjudication Hearing, 4/10/12, at 95.

---

[1] The front of the house faced the road, and, as viewed from that perspective, the parking area was located immediately behind the house on the left hand side, with the barn situated some distance further back to the left and rear of the house. All locational descriptions hereinafter provided in this opinion proceed from a vantage point of a viewer facing the house from the road.

In preparation for the final move, which was to take place during the upcoming weekend, some of J.B.'s personal belongings, including his clothes, had already been placed downstairs inside of the shared first floor bedroom. N.T. Adjudication Hearing, 4/11/12, 68-69. After awakening, J.B. went downstairs, entered that bedroom, where the victim was sleeping at the time, retrieved his clothes, and got dressed in a nearby bathroom. *Id.* at 69. After dressing, J.B. sat on the couch with J.H. and watched television. *Id.* A.H. was still asleep. *Id.* at 66. J.B. recalled that while he and J.H. were watching television, he heard the victim click her cell phone — either open or shut — which he presumed was her checking the time. Immediately thereafter, the victim called out to them that "they needed to leave or they would be late for the bus." *Id.* at 70. J.B. and J.H. left the house one or two minutes later, which J.B. estimated was around 8:13-8:14 a.m., since both children normally caught the school bus that transported them to Mohawk Elementary School around 8:12 a.m. every morning. *Id.* at 89. As J.B. exited the house, he noticed a large black truck parked by the garage.[2] N.T. Adjudication Hearing, 4/11/12, at 65-66.

The driver of the school bus which arrived to pick up the children noted that, when he first saw J.B. and J.H., they had made it a third of the way down the driveway, and were walking toward the road, with J.B. a little bit ahead of J.H. N.T. Adjudication Hearing, 4/10/12, at 152. Once the children saw the school bus, however, the driver recalled they both began to run down the driveway toward the bus with J.B. outpacing J.H. by about ten yards during the run. *Id.* at 153. As they ran towards the bus, the driver did not notice anything unusual in the way the children were acting, and, at no time while he was watching them, did he observe them leave the driveway, or throw anything. *Id.* at 154, 156. Once the children got to the bus, they each took their respective assigned seats, as per their normal routine. *Id.* at 153-54. The bus driver recalled observing nothing out of the ordinary about the children's behavior after they had gotten on the bus and during the time they were being transported to school. *Id.*

---

[2] As the Superior Court noted, the house had four entrances, *In re J.B.*, 69 A.3d 268, 280 n. 11 (Pa. Super. 2013); Trial Exhibits 3, 4, 8, and 29 (photos of the house). C.B. testified that, as was their usual practice, J.B. and J.H. would likely have exited the house through a laundry room door located on the right hand side of the house opposite the driveway. In order to get to the driveway from that exit, a person would have to immediately turn left — and, thus, be facing the garage behind the house — then proceed down a flight of stairs, turn left again, and walk through the parking area between the house and garage. N.T. Adjudication Hearing, 4/11/12, at 156-57. According to C.B., the family never used the front door of the house. *Id.* at 155, 157-58.

Approximately 45 minutes after the children got on the school bus — shortly after 9:00 a.m. — a six-person work crew from a tree service company arrived at the premises to finish collecting firewood they had cut and collected the previous day from the wooded area located in front of the house. *Id.* at 13, 19, 29. The crew came in three trucks, with the lead truck driven by the owner of the business — Gary Cable — entering the driveway first. Cable and his workers parked their trucks between the front of the house and the woods line which was also in front of the house, but closer to the road. Cable and his crew remained in that area all day. *Id.* at 18. Cable remembered that there was a "light" coating of snow at the time on the ground, which he estimated was approximately 1/8-1/4 of an inch in depth. *Id.* at 20. Cable did not recall seeing any tire tracks in the driveway on his arrival, although he did note that the center of the driveway was "humped up" when he pulled in. *Id.* at 22, 31.[3]

Cable and his crew began working, after which one of his workers came to him and reported seeing the screen door to one of the entrances to the house standing open. *Id.* at 23. Cable told the worker that he would keep an eye on it. *Id.* Approximately ten minutes later, Cable noticed the door open again and observed a little girl — A.H. — crying; whereupon, Cable went up to the porch to see what was the matter.[4] A.H. told Cable that "her mother was dead." *Id.* at 25. Cable called 911 and sent one of his workers — Gary Suhanec — to the end of the driveway to flag down the state police officers who had been dispatched. Cable, without entering the house, attempted to console A.H. by speaking to her through the door, and Cable instructed her to get her blanket from the couch and come over to the door so he could talk to her and keep her calm. *Id.* at 26-27.

While waiting for the police to arrive, Suhanec called Cable on his cellphone and informed him there were footprints on the driveway. *Id.* at 37. It was at that point that Cable observed two sets of small footprints in

---

[3] In his testimony at the adjudication hearing, Cable conceded that, based on the amount of snow he observed, had a vehicle been driven on the driveway at 6:45 a.m. it would "definitely" have left tire tracks. *Id.* at 32. C.B. also testified at the adjudication hearing that Cable informed him, when they conversed on the evening of February 20, 2009, that one of his employees had seen tire tracks and that C.B. had requested that Cable tell the investigating officers about this. N.T. Adjudication Hearing, 4/11/12, at 153. Cable did not recall any of his employees commenting on the presence of tire tracks. N.T. Adjudication Hearing, 4/10/12, at 39.

[4] It was not clear from the record which entrance the worker and Cable were referring to.

the center of the driveway between "[w]here the tire tracks run on either side of the driveway." *Id.* at 38, 40. Cable estimated this was approximately 45 minutes after he arrived — around 9:45 a.m. *Id.* at 36.

The first state police officers — Troopers Harry Gustafson and Corporal Jeremy Bowser — arrived on the scene at 10:13 a.m. *Id.* at 43-46. Trooper Gustafson encountered A.H., who was crying, at the front door. He picked her up and then took her into the residence and sat her on the couch to watch television. Upon entering the residence through the front door, he immediately saw the body of the victim lying on her left side on the bed in the bedroom with a "very large" pool of blood by her head and upper shoulders and soaking the sheet beneath. *Id.* at 49, 71. Troopers Gustafson and Bowser engaged in emergency ventilation measures until paramedics arrived.

During the performance of these resuscitative efforts, the school nurse called the victim's cell phone requesting to speak to her. Trooper Gustafson answered the phone, identified himself, and talked to the nurse, who indicated that J.B. was in her office because he was not feeling well and that he was requesting to come home for the day. *Id.* at 59-60. Trooper Gustafson asked the nurse to "baby-sit" J.B. until they could make arrangements to have someone pick him up. *Id.* at 60.

The paramedics arrived at around 10:40 a.m. and began to examine the victim. *Id.* at 85. During the examination, one of the paramedics noted a gunshot wound to the back of her head. *Id.* at 81-82. The paramedics could not detect any life signs from the victim, nor any fetal heartbeat. *Id.* at 81. At this point, other crime scene investigators from the Pennsylvania State Police and the Lawrence County Coroner's Office were sent to the scene, after which the victim and her unborn fetus were pronounced dead. In a short period of time thereafter, state police investigators confirmed that C.B. was at work that morning as he claimed, and, after a gunshot residue test of his hands was negative, he was quickly eliminated as a suspect. N.T. Adjudication Hearing, 4/11/12, at 63, 82, 138, 147.

One of the state police officers who arrived at the home was Trooper Janice Wilson, who, upon arrival, spoke briefly with A.H. Because A.H. was in a state of shock, she could not provide coherent answers to Trooper Wilson's questions. *Id.* at 60-61. Trooper Wilson next went to Mohawk Elementary school to interview J.H. and J.B.

Upon arrival at the school — shortly after noon — Trooper Wilson asked to speak to J.B., but was informed he was sleeping in the nurse's office because he had a stomach ache. *Id.* at 63, 70. Trooper Wilson then spoke with J.H., who initially was distraught because she thought she

was in trouble; however, she calmed down after the school guidance counselor informed her she was not. *Id.* at 64. Trooper Wilson interviewed J.H. for about ten minutes, but recalled that "[s]he really didn't have much to offer about what happened that morning." *Id.*[5] J.H. did not testify at the adjudication hearing.

J.B. was then awakened in the nurse's office and brought by his guidance counselor to be interviewed by Trooper Wilson in a nearby conference room. Trooper Wilson did not inform J.B. of the death of the victim, but, instead, asked him who had been present that morning in the house, and he replied that "it was his mom, referring to [the victim], and his two sisters and himself." *Id.* at 65-66. He noted that his dad had already left for work, and A.H. was asleep and did not wake up before he and J.H. left for school. *Id.* Trooper Wilson next asked J.B. "if he had seen anyone else around or any vehicles there that day?" *Id.* J.B. replied that his mom's green van was there which she used to drive A.H. to school, and, also, "that he saw a black large pickup truck parked back by the garage." *Id.* Trooper Wilson pressed J.B. for details about the truck, since she believed that it possibly belonged to the individual who had killed the victim. *Id.* Trooper Wilson asked J.B. if the truck was running, and he stated that "he . . . didn't know." *Id.* Trooper Wilson inquired if J.B. "saw anyone around," and she recalled that he replied no. *Id.* J.B. remarked the truck was of the same kind that he would usually see when the owner of the farm and another man would be in when they came to feed the cows. *Id.* at 66-67. Trooper Wilson further queried J.B. about what he had done that morning, and he recounted, as detailed above, his actions of retrieving his clothes, getting dressed and going with J.H. to the bus after the victim's admonition to them to hurry up, and then his first observation of the black truck upon exiting the home. The interview concluded at that point.

Meanwhile, during the late morning and early afternoon hours, the state police began searching for Adam Harvey — the ex-boyfriend of the victim — because he had a history of making threats of violence against her. *Id.* at 125-26. At this time, the victim, as well as her parents, sister, and brother-in-law had a permanent Protection From Abuse ("PFA") order against Harvey, stemming from an incident which occurred in February 2008. During this incident, Harvey — then living in North Carolina — had called the victim's mother and "threatened to take [her] whole family out." Juvenile's Exhibit B, PFA Order 2/4/2008. Harvey was also the owner of a

---

[5] None of the trooper's interviews were recorded, and her testimony regarding the interviews she conducted was based on two reports prepared 6 days and 13 days after the interviews, respectively. N.T. Adjudication Hearing, 4/11/12, at 106-07.

black Ford F-150 pickup truck.  *Id.* at 222-26.  Harvey had returned from North Carolina in late October 2008, and had, within the previous two weeks, received paternity test results showing that A.H. was not his biological daughter.  *Id.* at 151, 191, 207.  Also, at some point during the preceding evening of February 19, 2009, Harvey confronted the victim's parents in a nightclub where he had gone to pick up food — resulting in his ejection from the club.  *Id.* at 126, 150.

Trooper Dominick Caimona was dispatched by his supervisor to find Harvey, who was staying with a family that Trooper Caimona knew — the Klingensmiths, in the City of New Castle.  *Id.* at 220-23.  When Trooper Caimona arrived at the Klingensmith residence, he was informed by Thomas Klingensmith that Harvey was residing at an address in Union Township, Lawrence County, and that Klingensmith would show him the address.  Klingensmith got into Trooper Caimona's car which proceeded along State Street — the main thoroughfare in Union Township.  As the state police cruiser approached the intersection of State Street and Miller Avenue, at around 1:20 p.m. in the afternoon, Klingensmith saw Harvey's black truck at the intersection and pointed it out to Trooper Caimona.  *Id.* at 221, 223, 226.  Trooper Caimona parked the police car and walked over to the truck; he asked Harvey to accompany him to the state police barracks to talk with him, and Harvey agreed.  *Id.* at 221.

Trooper Caimona noted that the intersection was located approximately 2 city blocks from the home of Harvey's parents where Harvey was staying.  *Id.* at 222.  Trooper Caimona observed that Harvey's truck had a light coating of snow on the hood and roof and that it was dirty, as if it had been driven.  *Id.* at 225.  Harvey was taken to the state police barracks and interviewed at around 2:23 p.m.  *Id.* at 139.  Harvey provided an alibi, stating that he had been home in the basement of his parents' house since 10:00 p.m. the previous evening, and that the only way out of the house was through the upstairs floor where his dad was.  *Id.* at 133.  Harvey's hands were tested at that time by investigators for the presence of gunshot residue, but none was detected.  *Id.* at 137.  Based on his proffered alibi, and the presence of snow on the truck, which, in the investigators' opinion, suggested that it could not have been driven to Wampum — a distance Trooper Caimona estimated to be 8-10 miles — and then back to his home without coming off, Harvey was excluded as a suspect.  *Id.* at 132-33, 223.

Also during the afternoon of February 20, Corporal Andrew Pannelle of the Pennsylvania State Police conducted a visual inspection of the inside of the house.  He observed that all of the doors to the house were unlocked, and, also, that the front door had blood on its frame.  N.T.

Adjudication Hearing, 4/10/12, at 124, 134.[6]  Corporal Pannelle, while walking through the first floor of the house, noticed a blue blanket on the floor near the front door, and he seized it because it had a hole in it, which he believed could have been indicative of a shotgun blast.  *Id.* at 127.  The blanket was subsequently subjected to microscopic examination and chemical testing and no gunshot residue, or blood, was found on it.  N.T. Adjudication Hearing, 4/11/12, at 121-23.

Upon entering the first floor bedroom where the victim's body was found, Corporal Pannelle noted that the television, which sat on top of an armoire located in the right hand side of the room, was turned on.  N.T. Adjudication Hearing, 4/10/12, at 102.  Observing that the doors to the armoire were closed, he opened them.  *Id.* at 103.  Inside the armoire, he saw a locked gun safe on the bottom shelf, which was later determined to contain two handguns and ammunition.  On the top shelf, Corporal Pannelle saw a work helmet and two boxes of shotgun shells — one opened and one closed.  *Id.* at 104.  The open box contained 16 unfired "Federal Premium" brand .20 gauge shotgun shells.  *Id.* at 106.

Corporal Pannelle, accompanied by Sergeant Markilinski, also of the Pennsylvania State Police, then proceeded to examine the second floor of the house.  Upon entering the front bedroom to the right of the stairwell — J.B.'s bedroom — both troopers noted the presence of six "long guns" partially covered by an orange blanket, which, as observed from the entrance to the bedroom, were standing in the left hand side corner of the room nearest the door, between a dresser and the wall.  *Id.* at 108-09.  The butt of one gun — a .30-.30 rifle — was protruding the furthest into the room as it leaned against the wall.  To its immediate right was a muzzleloader, and leaning directly against that weapon, on the right-hand side, was a .20 gauge shotgun — a "Harrington and Richardson . . . youth model."  *Id.* at 110-11, 121.  Both of these guns, like the other four in the group, were found standing upright against the back of the bedroom wall.  *Id.* at 139.  Corporal Pannelle began to remove individual guns from the group, one at a time, and hand them to Sergeant Markilinski for him to examine and determine if they were loaded.  *Id.* at 141.

The first gun removed by Corporal Pannelle was the flintlock rifle, which Sergeant Markilinski examined and noted nothing unusual about it.  *Id.* at 141.  The second weapon Corporal Pannelle handed to Sergeant Markilinski was the .20 gauge shotgun.  Sergeant Markilinski opened the breech of the shotgun and smelled burnt gunpowder in the breech, which

---

[6]  Although the blood was sent for forensic testing, no further information was provided at the hearing regarding its origin.

he pointed out to Corporal Pannelle, who also smelled the odor. *Id.* at 113. Sergeant Markilinski also observed gunpowder residue in the breech and in the barrel. *Id.* at 141-42. Both Corporal Pannelle and Sergeant Markilinski testified that, based on their personal experience with firearms, they believed the shotgun had been "freshly" or "recently" fired. *Id.* at 130-31, 142. However, both acknowledged that they were not offering expert opinions in this regard, and that they could not opine with any degree of scientific certainty exactly when the shotgun had been fired. *Id.* at 132-33, 143. The .20 gauge shotgun was seized by the troopers and sent for forensic examination. *Id.* at 147.

Because of the discovery of the shotgun, at 10:00 p.m. on the evening of February 20, Trooper Wilson re-interviewed J.B. at his grandmother's home where he was staying. N.T. Adjudication Hearing, 4/11/12, at 71-72. J.B. had not been informed of the victim's death previously by anyone so, prior to Trooper Wilson speaking with J.B., his father, C.B., took J.B. aside and told him "something bad had happened" and "[the victim] isn't with us anymore, she's in heaven." *Id.* at 72. Upon hearing this, J.B. became emotional and started crying. *Id.* Once he had calmed down, Trooper Wilson, along with another trooper, began to question J.B., with his father observing. Trooper Wilson described his demeanor as "low-key" and that he was not nervous, excited, or fidgety. *Id.* at 87.

Trooper Wilson asked J.B. for more details about the black truck and when he had first seen it. *Id.* at 73. J.B. recalled that he first saw the truck as he exited the house, when he reached in his pocket to see if he had ice cream money for school, and, in the process, dislodged a mass of fuzz from his pocket which fell to the ground. N.T. *Id.* at 73. When he bent over to pick it up, it was then he noticed the truck parked by the garage. *Id.* Trooper Wilson asked J.B. if J.H. had seen the truck, and he replied that he mentioned it to her but she didn't respond, as he believed she was, at that point, too far ahead of him to hear him. *Id.* at 74. J.B. also mentioned to Trooper Wilson that, while he was out that afternoon in a vehicle driven by one of his relatives, he observed a white S-10 truck which he said to his relative resembled the truck that was at the farm, except he stated that the truck at the farm was black and larger than the S-10. *Id.* at 94-95.

J.B. also informed Trooper Wilson that he had seen a person in a white hat ducking over inside the truck he observed at the farm. Trooper Wilson inquired of J.B. why he had not mentioned that when she talked with him that morning, and he explained that when he first glanced at the truck he didn't see anybody. *Id.* at 75. J.B. also recounted his observation that the lights were on inside of the truck, and when Trooper Wilson stated that he did not tell her that during the first interview, J.B.,

after hesitating, then described the lights as being "sort of half on." *Id.* at 75.

Trooper Wilson next asked J.B. if he had any guns, and he informed her that he had a .30-.30 rifle. *Id.* at 76. Trooper Wilson questioned J.B. as to whether he had a shotgun, and he replied yes. She inquired whether he knew what gauge it was, and he stated that "it was a 20-gauge," and further related that he only shot the gun outside and, also, that he had shot it with his dad last month. *Id.* at 77, 101. Trooper Wilson asked J.B. if he had fired the gun that morning, and he answered "no." *Id.* at 101. The interview ended at that point. *Id.* at 78.

At 3:30 a.m. on the morning of February 21, 2009, state police arrested J.B. at his grandmother's residence and charged him with the murder of the victim and her unborn fetus. N.T. Adjudication Hearing, 4/10/12, at 217.[7] No gunshot residue testing of J.B.'s hands was ever performed. When J.B. was arrested, he was wearing a polo shirt, blue jeans, a brown jacket, and tennis shoes. *Id.* These were the same clothes J.B. had on when interviewed by Trooper Wilson at his school at noon on February 20. N.T. Adjudication Hearing, 4/11/12, at 78.

Later during the morning of February 21, after sunrise, a team of state police officers searched the exterior grounds in the immediate

---

[7] Although only 11 years old, J.B. was charged as an adult, and he subsequently filed a decertification petition to transfer his case to the Juvenile Division of the Court of Common Pleas of Lawrence County. The [juvenile] court — Judge Dominick Motto — denied the petition on the grounds that, since J.B. consistently denied having committed the crimes with which he was charged during interviews with psychological experts, he had, in the court's view, not taken responsibility for his actions; therefore, based on these denials of culpability, the [juvenile] court reasoned that J.B.'s "prospects of rehabilitation [were] . . . likely to be unsuccessful." *Commonwealth v. Brown*, 26 A.3d 485, 490 (Pa. Super. 2011). J.B. was granted permission for an interlocutory appeal of Judge Motto's order, and the Superior Court vacated it. The Superior Court held that requiring J.B. to accept responsibility for the conduct he was alleged to have committed in order to obtain decertification would require him to effectively admit his guilt of the particular offenses charged, and, thus, violated his Fifth Amendment right against compulsory self-incrimination. See id. Consequently, the court remanded for a new decertification hearing, which, after the recusal of Judge Motto, was held before Judge John Hodge of the Court of Common Pleas of Lawrence County. Judge Hodge granted the decertification petition and presided over the adjudication and dispositional hearings held thereafter.

vicinity of J.B.'s residence, and along its driveway. N.T. Adjudication Hearing, 4/10/12 at 207, 211. Sergeant Daniel Brooks, in the company of several other state police officers, began walking outward from the porch and down the driveway toward the road. Just outside of the residence, adjacent to the porch area, they found a "very rusty" spent shotgun shell. *Id.* at 199, 202. As the officers walked further down the driveway in the direction of the road, they discovered a second spent shell. This shell — a "Federal Number 6" brand .20 gauge — was found approximately 100 feet away from the house on the left hand side of the driveway at the beginning of a fence line that ran the entire length of the left side of the driveway. *Id.* at 195-96, 198, 210. The spent shell was located near the base of the wire fence, a few feet from the middle of the driveway, and it was lying underneath leaves which were frozen and covered by ice and snow. *Id.* at 210. When asked by the prosecutor at the adjudication hearing[8] to describe the condition of the shell — on a sliding scale ranging from "pristine to the other spectrum being rusted and broken up" — Sergeant Brooks characterized the shell as pristine, and he agreed with the prosecutor that it was not weathered. *Id.* at 201-02.

Further along the driveway near the road, and embedded in the dirt of the driveway itself, the searching officers found a third spent shell which, like the shell found near the house, was "very rusty," and it was also physically crushed into the surface of the driveway. *Id.* at 204. In Sergeant Brooks' view, both rusty shells had been there "for quite some time." *Id.* at 199. However, Sergeant Brooks also opined that there was no way to estimate exactly how long any of the three shells had been lying outside. *Id.* at 209. These three spent shells were the only ones found during the troopers' search of the property, and, after being photographed in their original positions, they were collected as evidence. *Id.* at 205, 207.

At the adjudication hearing, the Commonwealth presented the testimony of Dr. James Smith — a forensic pathologist — as to the nature of the victim's gunshot wound.[9] Dr. Smith noted that he determined that the victim sustained a single gunshot wound to the back of her neck, which, because of the presence of shotgun pellets in and around the wound, he opined was inflicted by a shotgun. N.T. Adjudication Hearing, 4/10/12 at 161. Dr. Smith described this wound as being in the shape of "a large oval or ellipse" and "tangential," i.e., slanted. *Id.* at 160-61. Due to the trajectory of the wound — proceeding "slightly" from the back of the

---

[8] Because of a conflict of interest recognized by the current District Attorney of Lawrence County — Joshua Lamancusa — the Office of the Pennsylvania Attorney General took over the prosecution and currently represents the Commonwealth in this appeal.

[9] No forensic expert was called by J.B.'s counsel to testify on his behalf.

victim's body to the front and upward — Dr. Smith believed it had been inflicted as the victim was lying on her left side on the bed. *Id.* at 161, 179.

Dr. Smith further noted that hot gas from the shotgun blast entered the wound through the skin and muscle of the victim's neck and caused the skin to bulge out and rupture near the point of entry. *Id.* at 168. This phenomenon, known as "blowback," formed a "tract" or laceration in the skin. *Id.* To Dr. Smith, the nature of this type of damage indicated that the gas from the shotgun blast was mostly contained within the entry wound and did not have time to dissipate. *Id.* at 168-69. This factor, coupled with the presence of powder in the wound and "soot" around the surface of the skin near the point at which the pellets entered the skin, caused him to conclude that the shotgun was "very, very close to, or maybe even touching, the back of the neck" when it was fired. *Id.* at 168, 183-85. Although he could not give a precise distance, he estimated the shot was fired from a distance of closer than two inches from the victim's neck, and the barrel of the gun was in "close contact" with her skin at the time. *Id.* at 185.

Dr. Smith found that, as the pellets entered the soft tissues of the neck, a small portion of the pellets discharged a piece of bone from the occipital (rear) region of the victim's skull near its base, and then entered the interior of her cranial cavity. *Id.* at 161-62. In his estimation, these pellets caused damage to the centers of the victim's brain which controlled her autonomic nervous functions, thereby causing the death of both the victim and, because of the cessation of the victim's blood circulation, her unborn fetus. *Id.* at 160-61, 165; 173-78. Dr. Smith noted, however, that the vast majority of the pellets he observed had "rebounded back downward" and traveled back in the direction from which they had entered, resulting in them becoming lodged in the back of the victim's neck. *Id.* at 162.

Regarding the question of whether the blowback which occurred near the entry wound could have caused blood or other tissue material to travel backwards along the track of the pellets and enter the barrel of the shotgun, Dr. Smith opined that, generally, blowback is more common whenever hot gas from a gunshot wound penetrates beneath the skin and encounters bone which does not yield. *Id.* at 190-91. Dr. Smith acknowledged that the shot which entered the victim's wound impacted the bones of her skull. *Id.* at 191. Dr. Smith agreed that it was, therefore, possible that this impact could have caused tissue and blood to have been propelled back through the channel created by the shot and into the barrel of the gun; however, he believed the angle of the gun at the time the wound was made minimized the amount of blowback, and, thus, he opined that one would not expect to find as much blood or tissue as would

be present if the wound was inflicted straight into the skin, i.e., with the gun barrel held at a 90 degree angle thereto. *Id.* at 170-72, 186-92.

Also testifying at the adjudication hearing on behalf of the Commonwealth was a certified toolmark and firearm examiner — Trooper Paul Burlingame of the Pennsylvania State Police. Trooper Burlingame examined the .20 gauge shotgun seized from J.B.'s residence. After test firing the shotgun, and subjecting it to a "shock and drop" test, he determined that the weapon was not malfunctioning. N.T. Adjudication Hearing, 4/11/12 at 40. Trooper Burlingame related that he also compared the 27 shotgun pellets and pieces of wadding recovered from the body of the victim with pellets from one of the unspent .20 gauge Federal No. 6 brand shotgun shells found in the armoire of the victim's bedroom.[10] Trooper Burlingame noted that pellets and wadding discharged from smooth bore shotguns, like the .20 gauge recovered from J.B.'s bedroom, do not have any marks on them which would make them generally usable for conducting an individual examination. *Id.* at 40, 47.[11] Trooper Burlingame, therefore, could not perform an individual examination of the pellets recovered from the victim and the pellets in the unfired .20 gauge shells taken from the armoire. He did note, though, that the 27 shotgun pellets recovered from the victim were "consistent" in size, shape, weight, material,[12] and construction with the pellets in the unfired shells, and, also, that the pieces of wadding taken from the body of the victim were "consistent" with the type of wadding in the unfired .20 gauge shells. *Id.* at 45. Trooper Burlingame also testified that markings created by the manufacturing process, which were found on the discharged shotgun shell recovered from along the fence line of the driveway, were the same as the markings on the unfired .20 gauge shells in the armoire.

---

[10] Shotgun shell wadding is normally constructed of either plastic or fiber material, and Trooper Burlingame explained that there are normally two areas in which wadding is found in every shotgun shell: "an over-powder post-type wad" which covers the powder in the shell and a "cup wad" which holds the shot itself. N.T. Adjudication Hearing, 4/11/12, at 45.

[11] Trooper Burlingame described the process of individual examination as using a comparison microscope to examine, side by side, an article of discharged ammunition recovered from a crime scene and an article of discharged ammunition test fired from a particular gun, in order to determine whether the tool markings on each article of discharged ammunition, uniquely produced by every individual gun manufactured, match. *Id.* at 42-43.

[12] It does not appear from the record that Trooper Burlingame conducted any comparative metallurgical analysis of the shot recovered from the victim and the shot contained within the unspent shells, but only a comparison of their exterior characteristics.

*Id.* at 44. This led to his conclusion that the discharged shell had been fired from the .20 gauge shotgun taken from J.B.'s bedroom. *Id.* at 44, 47.

Additionally, Elana Somple, the manager of the forensic science department of R.J. Lee Laboratory — a materials testing laboratory — testified at the adjudication hearing regarding the results of her testing of the shirt and pants J.B. was wearing at the time of his arrest for the presence of gunshot residue.[13] Ms. Somple explained that, whenever a firearm is discharged, the firing pin impacts with the primer cap of the ammunition loaded in the firearm, which causes the chemical elements therein — lead, barium, and antimony — to ignite, and this force of ignition propels the bullet or projectile in the ammunition out of the front of the muzzle of the gun. *Id.* at 8-9. According to Ms. Somple, the rapid ignition of these 3 elements after the impact of the firing pin with the primer cap causes them to vaporize and form a plume, or cloud, around the firearm. *Id.* at 9. Eventually, the airborne particles in the cloud coalesce and land on areas immediately surrounding the firearm, such as the shooter's hands or clothes. *Id.* Ms. Somple noted that whenever a particle is found with all 3 elements of lead, barium, and antimony fused together, it can be said with scientific certainty that the particle is gunshot residue produced from the discharge of a firearm. *Id.* at 9-10.

Ms. Somple described how she dabbed both sides of the front of J.B.'s shirt and the front of his jeans with double-sided sticky tape and then examined the particles lifted by the tape under a scanning electron microscope. Her examination revealed one particle of gunshot residue on the right side of J.B.'s shirt and one particle of gunshot residue on the left leg of his jeans. *Id.* at 16-17. Ms. Somple could not pinpoint which specific area on each article of clothing that the individual particles were found. *Id.* at 16. She also opined that the particles could have gotten onto the clothing in one of three separate ways: "[t]he person could have discharged the firearm[;] or been in close proximity to somebody else who discharged a firearm[;] or they came into contact with something that had gunshot residue on it." *Id.* at 21. Ms. Somple further related that such particles can have an enduring presence on articles of clothing, noting: "If I discharged a firearm and took my clothes off, put them in the corner of my room and they were undisturbed for a month, two months, a year, and then tested those clothes, you could still find gunshot residue on them." *Id.* at 23. By contrast, she explained that a person who discharged a firearm and then went about his or her daily activities would have any gunshot residue on his or her hands removed by those activities. *Id.* at

---

[13] The then-District Attorney of Lawrence County — John Bongivengo — elected not to have R.J. Lee Laboratories test J.B.'s coat and shoes for gunshot residue. N.T. 4/11/12 at 136.

13. Ms. Semple additionally related, "[a]s a rule of thumb," that she would expect to see more particles of gunshot residue deposited on someone who fired a gun inside of a house, where there is no airflow, than someone who fired a gun outside where the wind could affect the deposition of the particles. *Id.* at 27-28.

Corporal Jeffrey Martin of the Pennsylvania State Police testified at the adjudication hearing regarding the results of other forensic tests performed on J.B.'s clothing, the spent shotgun shell found along the fence on the left-hand side of the property surrounding J.B.'s home, and the .20 gauge shotgun taken from the residence. Corporal Martin testified that J.B.'s jacket, shirt, jeans and sneakers seized the morning of his arrest were all tested for the presence of blood stains, and no such stains were found. *Id.* at 123-24. No fingerprints or DNA material were found on the spent shotgun shell. Forensic examination of the shotgun itself revealed no latent fingerprints on the weapon, and no blood was detected in the interior of the shotgun barrel, on the exterior of the barrel, or on the frame of the shotgun. *Id.* at 122.

C.B. testified at the adjudication hearing that he, the victim, J.B., and her daughters all had a close relationship and that J.B.'s relationship with the victim was "[j]ust as normal as it was between her and her own daughters." *Id.* at 141. With respect to the use of firearms on the property, C.B. related that he would quite frequently shoot guns in the area of the property located in front of the house near where the work crew parked on the morning of February 20, 2009. *Id.* at 142. C.B. also described his and J.B.'s participation in a turkey shoot at an indoor shooting range on Saturday, February 14, 2012 — less than a week before the .20 gauge shotgun was seized. *Id.* at 143, 182-83. C.B. recalled that J.B. used the .20 gauge shotgun in the turkey shoot and that he loaded and unloaded the shotgun for J.B. each time it was fired. *Id.* at 145.[14] C.B. also recounted that, because it was a cold winter evening, and the shoot took place in a large garage like structure, J.B. was wearing his winter coat during the entirety of the shoot, which was the same coat he was wearing on the day of his arrest. *Id.* at 146.

C.B. further testified that he and the victim chose to have an unlisted phone number at their house in order to ensure that Adam Harvey could not contact them. *Id.* at 149. C.B. related that he listened to 10-12 voicemails Harvey had left on the victim's cellphone, in which Harvey threatened the victim and her family, and that the victim feared Harvey.

---

[14] Trooper Wilson confirmed J.B.'s participation in the "turkey shoot" with the .20 gauge shotgun. N.T. Adjudication Hearing, 4/11/12, at 102.

*Id.* at 149, 177. C.B. had no personal knowledge of whether Harvey knew where he and the victim lived. *Id.* at 174.

Adam Harvey testified at the adjudication hearing as well. He denied making threatening phone calls to the victim and denied the averments in the victim's PFA petition which led to the entry of the PFA order against him. *Id.* at 200-01. Harvey also stated that he was not upset about the blood test results which showed he was not the father of A.H. *Id.* at 207. Harvey admitted seeing the victim's parents on the evening of February 19, 2009, as he was walking out of a nightclub while picking up an order of chicken wings, and that he was told to leave. *Id.* at 208. Harvey claimed that he went home thereafter to his parents' house, where he was living in the basement, which was accessible through a side door on the upstairs floor. He denied going out at all on the night of February 20, and he stated that he did not leave his parent's home until somewhere around 9:00 the next morning to return an automotive part to a store. *Id.* at 211-12. Harvey disavowed knowing where the victim was living, although he acknowledged having told the state police that people had previously informed him she was living "somewhere in Wampum." *Id.* at 210.

*In re J.B. II*, 106 A.3d at 77-88.

## II. Procedural History

At the conclusion of the juvenile hearing, counsel for J.B. orally moved for a judgment of acquittal, contending that the evidence was insufficient as a matter of law to sustain a guilty verdict since it did not establish beyond a reasonable doubt that J.B. had committed the homicides. The juvenile court denied this motion and adjudicated J.B. delinquent of all charges. In its dispositional order, the juvenile court remanded J.B. to the custody of a secured facility until he reached the age of 21.[1] J.B. did not file post-dispositional motions but instead filed a notice of appeal to the Superior Court.

---

[1] J.B., who has consistently maintained his innocence throughout the entirety of these proceedings, was released from custodial detention after successfully completing all of the goals set forth in his rehabilitation plan, and with the acquiescence of the Attorney General. He is reportedly attending college in another state. Nevertheless, he remains entitled to appellate review of his adjudication which, of course, carries with it a public stigma.

In his Statement of Matters Complained of on Appeal, J.B. raised the sole claim that the verdict was against the weight of the evidence. Although the juvenile court issued findings of fact and authored an opinion in support of its adjudication, it did not address this claim therein; rather, it issued a terse order denying the weight-of-the-evidence claim.

Although the Commonwealth argued to the Superior Court that J.B.'s weight-of-the-evidence claim was waived due to his failure to file post-dispositional motions, that court rejected this argument and proceeded to conduct appellate review of J.B.'s weight-of-the-evidence claim. *In re J.B.*, 69 A.3d 268 (Pa. Super. 2013) ("*In re J.B. I*"). The court reviewed all of the evidence in the certified record in order to determine whether the juvenile court abused its discretion in making certain key findings of fact in support of its adjudication, namely its finding that there were no unaccounted for footprints or tire tracks around the home, and that no one was seen approaching or leaving the residence. In the juvenile court's view, this precluded any possibility that another individual could have entered the residence after the children had left for school and the victim's body was found. *Id.* at 279. The Superior Court determined these findings to be unsupported by the record and, indeed, contrary to the evidence. Thus, that tribunal ruled that the juvenile court palpably abused its discretion in making its weight-of-the-evidence ruling, vacated the dispositional order, and remanded for further proceedings.[2] *Id.* at 281. The court did not address whether the evidence was insufficient to sustain the verdict, as J.B. had not asserted such a claim in his appeal.

The Commonwealth sought review of this decision from our Court, again contending that J.B.'s weight-of-the-evidence claim was waived due to his failure to file

---

[2] This opinion was authored by then-Judge, now-Justice Donohue, and joined by Judge Shogan and then-Judge, now-Justice Wecht.

post-dispositional motions. Our Court accepted review, but held that J.B.'s weight-of-the-evidence claim was not waived for failure to file post-dispositional motions, inasmuch as the Juvenile Rules of Procedure did not require the filing of post-dispositional motions in order to preserve a weight-of-the-evidence claim for appellate review, and as J.B. had preserved this issue when he raised it in his statement of matters complained of on appeal. *In J.B. II*, *supra*. Our Court remanded this case to the juvenile court so that J.B. could file post-dispositional motions *nunc pro tunc*.

Following remand, J.B. filed a post-dispositional motion *nunc pro tunc* in which he alleged that the adjudication must be vacated because the evidence was insufficient as a matter of law to sustain his conviction, and, alternatively that he was entitled to a new adjudication hearing since the adjudication was against the weight of the evidence. The juvenile court conducted no new hearings, but, rather, heard argument and accepted briefing from both parties on the issue. The court then issued an opinion on May 19, 2015 in which it found that the evidence was sufficient as a matter of law to establish J.B. as the perpetrator of the homicides, and that its verdict was not against the weight of that evidence.[3]

In ruling on J.B.'s sufficiency claim, the juvenile court did not rely on the absence of footprints around the residence as it had in its first opinion. Instead, the court relied on the following facts to support its adjudication of J.B. delinquent beyond a reasonable doubt: (1) J.B. owned a .20 gauge shotgun "that was established to be the murder

---

[3] According to J.B., the juvenile court purportedly made new findings of fact and credibility determinations in its post-remand opinion, and J.B. challenged the propriety of this action in his petition for allowance of appeal. We did not accept this question for review; moreover, inasmuch as a challenge to the sufficiency of the evidence raises a pure question of law, and, in addressing such a challenge, we review the record *de novo*, we need not address this question presently. *See, e.g., Commonwealth v. Packer*, 168 A.3d 161, 163 n.2 (Pa. 2017).

weapon"; (2) the gun smelled as if it had recently been fired; (3) only a limited number of people knew where the gun was stored, including J.B.; (4) J.B. knew how to fire a shotgun; (5) J.B. had one particle of "gunshot residue" on the right side of his shirt, and, found in that same location, were 14 particles which contained two of the three elements that, together, constitute gunshot residue (lead, barium and antimony), which the court viewed as suggestive;[4] and J.B. had one additional particle of gunshot residue on the left side of his jeans, in addition to, in that the same location, 17 particles containing two of the three constituent elements of gunshot residue and 15 particles containing a single constituent element of gunshot residue; (6) a "pristine" spent shotgun shell, consistent with the type of shotgun shells found in a box in the armoire in the victim's bedroom, was found along a fence running parallel to the driveway where J.B. and J.H. walked on the way to the bus, thus supporting the Commonwealth's hypothesis that J.B. discarded the shell while on the way to the school bus; and (7) there was no sign of forced entry into the home, or of a struggle inside or outside of it. Juvenile Court Opinion, 5/19/15, at 39-41.[5]

---

[4]  As explained more fully herein, Elana Somple testified that, for a particle to be scientifically identified as gunshot residue, it must contain *all three* of these elements, and the mere presence in a particle of one or two of these elements is insufficient from a scientific standpoint to conclude that the elements were deposited there by the discharge of a firearm.

[5]  The juvenile court also found, based solely on the Commonwealth's closing arguments, that J.B. was "adversely affected by his father's relationship with the victim and the expected arrival of a baby boy," as well as the fact that J.B. felt left out of family affairs. Juvenile Court Opinion, 5/19/15, at 36. The juvenile court theorized these feelings of estrangement, coupled with the move of his belongings to the downstairs bedroom, may have given J.B. motive to commit the crime. *Id.* Based on our review of the record, we agree with J.B.'s argument that these assertions are wholly speculative and based upon no evidence whatsoever. Indeed, as recited above, the only evidence of record regarding the relationship between J.B. and his stepmother was that provided by his father, who indicated the relationship was a positive one. Moreover, and in any event, arguments of counsel are not evidence, *see Commonwealth v. Roney*, 79 A.3d 595 (Pa. 2013), and motive is not an element of the offense of first-degree murder, *see* (continued…)

Based on this evidence, the juvenile court found that it was unrealistic to conclude that an unidentified individual had entered the residence without disturbing its contents, retrieved the shotgun from the upstairs bedroom, taken the ammunition from the armoire, and, after shooting the victim, replaced the gun in the upstairs bedroom and then discarded the spent shell along the fence line.  Accordingly, the juvenile court found the evidence sufficient to establish beyond a reasonable doubt that J.B. was the perpetrator.  The juvenile court relied on this same evidence to conclude that its adjudication of J.B.'s delinquency was not against the weight of the evidence.

J.B. appealed to the Superior Court which, in a split panel decision, *In re J.B. III*, 147 A.3d 1204 (Pa. Super. 2016) ("*In re J.B. III*"),[6] affirmed the juvenile court.  The Superior Court rejected J.B.'s claims that the juvenile court improperly reassessed the evidence and made new credibility determinations in ruling on J.B.'s post-dispositional motions.  That tribunal also rejected his sufficiency and weight-of-the-evidence claims, relying on the same evidence recited by the juvenile court in its opinion.

J.B. petitioned our Court for review of this decision, which we granted, in order to consider his claims that the evidence was insufficient as a matter of law to sustain the adjudication of the juvenile court, and that its adjudication was against the weight of the evidence.

### III.  Standard of Review

As this case involves the interpretation and application of the standard for appellate review of a sufficiency-of-the-evidence claim, and because we find this claim dispositive for reasons set forth herein, we begin with a review of the development and

(…continued)

18 Pa.C.S. § 2501.  Consequently, in performing our sufficiency review, we completely disregard the trial court's findings in this regard.

[6] This opinion was authored by Judge Stabile and joined by Judge Olsen, with Judge Musmanno noting his dissent but not authoring a separate writing.

use of this standard by our Court from its inception at the common law to the present, where it has attained the status of a constitutionally mandated requirement of appellate review of a criminal conviction under the Due Process Clause of the United States Constitution.

From the earliest days of our Commonwealth, our Court has reversed criminal convictions of individuals on the basis that the evidence relied upon by the prosecution to obtain those convictions was "insufficient." *See Krause v. Commonwealth*, 93 Pa. 418, 422 (Pa. 1880) ("In favor of the liberty of the citizen, the court may, and in a proper case, should declare the evidence insufficient to convict."). In making the determination as to whether sufficient evidence was introduced at trial to support an appellant's criminal conviction, our Court incorporated into the process of appellate review the by then widely accepted common law principle that, in order for a criminal conviction to be lawful — such that the Commonwealth is empowered to deprive an individual of his or her life, liberty, or property as punishment — the prosecution bears the burden of establishing, beyond a reasonable doubt, that the individual committed all of the requisite elements of the criminal offense with which he is charged. By the 1930s, our Court's practice of reviewing the trial evidence to determine whether the Commonwealth had proven each of the elements of the offense charged beyond a reasonable doubt was well established. *See, e.g.*, *Commonwealth v. Karmendi*, 195 A. 62, 63 (Pa. 1937) (in review of claim that trial evidence was insufficient to sustain first-degree murder conviction, we examined the evidence introduced by the Commonwealth at trial to determine if the elements of that offense had been established — *i.e.*, "was there sufficient evidence, direct or circumstantial, from which the jury might

find beyond a reasonable doubt a homicide of the first degree, committed by the accused?").[7]

Thereafter, our Court formulated the following standard of review to assess a sufficiency-of-the-evidence claim, which explicitly considers whether the evidence proved at trial established the appellant's guilt of each element of the offenses charged beyond a reasonable doubt:[8]

> The facts and circumstances proved must, in order to warrant a conviction, be such as to establish the guilt of the defendant, not necessarily beyond a moral certainty, nor as being absolutely incompatible with his innocence, but at least beyond a reasonable doubt.

*Commonwealth v. Bausewine*, 46 A.2d 491, 493 (Pa. 1946).

However, our Court was also careful to later emphasize that, in undertaking sufficiency review, we would not act in the capacity of a "super-jury" to reconsider and re-determine the facts of the case adduced at trial and decide, anew, an appellant's guilt or innocence. Therefore, we specifically admonished advocates presenting this type of claim to our Court to refrain from essentially retrying their cases before our tribunal by marshalling facts and evidence of record which favors only their theory of the appellant's innocence and disregards the Commonwealth's evidence:

---

[7] It is noteworthy that appellate review of the sufficiency of the evidence using the beyond a reasonable doubt standard became normative at a time when there was widespread national interest in the problem of wrongful convictions in the aftermath of the notorious Sacco and Vanzetti case. *See* Chad M. Oldfather, *Appellate Courts, Historical Facts, and the Civil Criminal Distinction*, 57 Vanderbilt Law Review 437 n.141 (2004).

[8] As we discuss *infra*, the question of whether the defendant's guilt has been established by the Commonwealth for each element of the offense beyond a reasonable doubt remains the pivotal inquiry in our analysis of a sufficiency of the evidence claim. *See Packer*, 168 A.3d at 163 n.2.

It has become customary for a defendant in his argument before an Appellate Court to base his claims and contentions upon his own testimony or that of his witnesses even after a jury has found him guilty. This, of course, is basic error. After a plea or verdict or guilty, 'We accept as true all of the Commonwealth's evidence upon which, if believed, the jury [or a Judge sitting as a jury] could have properly based its verdict.' . . . Moreover, it is well settled that a jury or a trial Court can believe all or a part of or none of a defendant's statements, confessions or testimony, or the testimony of any witness.

*Commonwealth v. Kirkland*, 195 A.2d 338, 342–43 (Pa. 1963) (quoting *Commonwealth v. Gooslin*, 189 A.2d 157, 158 (Pa. 1963)). Likewise, we have established that the Commonwealth, as verdict winner, is entitled to the benefit of all reasonable inferences which could be drawn from the evidence it presented at trial. *Commonwealth v. Moore*, 157 A.2d 65, 68 (Pa. 1959).[9] We regard this deferential manner of appellate review as according appropriate respect to the role of the jury or a trial judge sitting without a jury to make credibility determinations and factual findings based on their weighing of the evidence which they hear firsthand.

Critically, however, our Court has also long made an exception to this principle of appellate deference in recognition of the fact that, in some cases, the entire body of evidence introduced at trial which furnished the basis for an appellant's conviction is so deficient that it does not reasonably support a finding of guilt beyond a reasonable

---

[9] The *Moore* Court incorporated this requirement into our sufficiency of the evidence standard of review from a statute, 19 P.S. § 871 (repealed), Act of June 15, 1951, P.L. 585, § 1, governing the manner in which a court was to dispose of a motion in arrest of judgment after a verdict of guilt. Even though this statute has since been repealed, and it is well established that, after the passage of the Constitution of 1968 by the voters, this Court has exclusive authority to set standards of procedure for all courts in the Unified Judicial System, our Court nevertheless retains this aspect of sufficiency review in our jurisprudence.

doubt, as a matter of law. *See, e.g., Commonwealth v. Jackson*, 66 A.2d 841, 843 (Pa. 1949) ("Because of the insufficiency of the evidence as a matter of law, the conviction cannot stand.").

Thus, in those atypical situations, our Court has consistently held that we are not bound by the factual findings and credibility determinations rendered by the finder of fact, and we are compelled in such circumstances to reverse a legally erroneous conviction. *See Commonwealth v. Libonati*, 31 A.2d 95, 97 (Pa. 1946) (holding that question of whether the trial evidence established guilt beyond a reasonable doubt is for the finder of fact "unless the evidence 'be so weak and inconclusive that as matter of law no probability of fact can be drawn from the combined circumstances'" (quoting *Commonwealth v. DuBoise,* 112 A. 461, 463 (Pa. 1921)); *Bausewine*, 46 A.2d at 493 ("[I]t must be remembered that guilt must be proved and not conjectured. The reasonable inference of guilt must be based on facts and conditions proved; it cannot rest solely on suspicion or surmise. These do not take the place of testimony.").

Notably, this principle was applied by our Court in the case of *Commonwealth v. Woong Knee New*, 47 A.2d 450 (Pa. 1946), to reverse a murder conviction when all of the circumstantial evidence of record presented at trial, which our Court accepted as true, did not establish the defendant's guilt beyond a reasonable doubt, but, rather, was in "equipoise" on this question. That is to say, the trial evidence equally supported two reasonable but diametrically opposed ultimate inferences: one that the defendant committed the murder, and the second that he did not commit the murder.

In *Woong Knee New*, the victim, a proprietor of a laundromat in Chester County, was found dead on Sunday, June 24, 1943, lying in a pool of blood on the floor in his apartment, having been bludgeoned to death with a hammer. The apartment had been ransacked and money that the victim had stored therein was missing. The apartment

bore gruesome testament to the viciousness of the crime, as there was extensive blood spatter evidence throughout. A brown hat with a red feather in the band and a human hair inside was discovered on his bed, and a half empty bottle of beer was observed sitting on the kitchen table. The defendant, who was an acquaintance of the victim, and who visited him fairly regularly, was being detained in New York on an immigration violation. He became a suspect in the murder and was questioned extensively by detectives. During the interrogation, according to the detectives, the defendant, who was of limited fluency in the English language, admitted to being with the victim on Sunday morning until 4:00 a.m. and drinking beer in his apartment; however, when the detectives inquired further about his interactions with the victim, he terminated the interview, claiming illness. While in custody, the defendant, who had quit his job in a shipyard earlier in the week, was found in possession of over $1,200 dollars, after he denied having any money on his person.

The defendant was arrested and charged with first-degree murder. At trial, the Commonwealth introduced a panoply of circumstantial evidence to establish that the defendant had murdered the victim: the defendant's alleged statements to detectives admitting that he was with the victim until 4:00 a.m. Sunday morning and that he left for New York later that morning at 10:30 a.m., which was characterized by the prosecution as flight, and, thus, was evidence of his consciousness of guilt; testimony of witnesses who claimed to have seen the defendant in Chester County on the night of the murder; testimony from the coroner who approximated the time of the victim's death at between 2:30 and 4:30 a.m. based on the progress of rigor mortis in the victim's body; testimony that, on the Saturday evening preceding the murder, a witness saw the defendant wearing a brown hat that looked like the one found in the victim's bedroom, which the Commonwealth theorized was left behind by the defendant in his haste to flee the

apartment after committing the crime; the fact that there was no evidence of forced entry into the apartment, suggesting that the killer was a person, like the defendant, known to the victim so that the victim let him into the apartment voluntarily; the victim was known to carry large sums of money, and the defendant was, at the time of his arrest, found with a substantial sum of money, even though witnesses testified that they had never seen the defendant carrying large amounts of cash on his person before, and he did not earn substantial pay in his employment.

The defendant, through cross-examination and the testimony of his own witnesses, presented the following evidence to the jury: the coroner's admission under cross examination that he could not fix the exact time of death, given the varying speeds with which rigor mortis progresses that are dependent on the age and physical condition of the body; testimony that the murder weapon, the hammer, was examined by the FBI and no fingerprints or other physical evidence were found on the hammer to establish that the defendant had used it to commit the murder; the fact that the defendant's fingerprints were not found on the half-empty beer bottle; expert testimony that the hair found in the brown hat was the victim's, and other testimony showing that, on the few occasions defendant was observed wearing a brown hat, it did not have a red feather in the band; testimony that, despite the considerable amount of blood sprayed about in the commission of the crime, the clothes the defendant was wearing at the time of his arrest had no trace of blood on them; the testimony of three witnesses that the defendant was in New York on the night of the murder gambling with them; the testimony of the defendant in which he denied giving the statements which the detectives testified that he gave, claiming he did not understand their questions and that they physically coerced him; evidence that he was preparing for deportation during the week of the murder and had shipped his clothes to New York the preceding Thursday

before the murder, and had actually left Chester County the following Friday morning at 1:00 a.m.; testimony that some of the money in his possession was from his savings which he had withdrawn from his bank earlier in the week, as he feared he would be deported; and bank records showing withdrawals of money, albeit not the entire amount he was found with. The jury, after hearing all of this evidence, returned a verdict of guilty of the charge of first-degree murder.

Our Court reversed the defendant's conviction on the grounds that the evidence was insufficient for a jury to have been convinced beyond a reasonable doubt that the defendant murdered the victim. Specifically, our Court examined all of the above-discussed evidence, highlighted its contradictory nature, and found that it, at most, supported two equal but fundamentally inconsistent inferences on this question. Our Court noted the testimony of the coroner did not fix the exact time of death and only provided a range of times based on rigor mortis in which the death could have occurred; thus, this did not prove beyond a reasonable doubt that the defendant was with the deceased at the time of death. In any event, our Court reasoned that, even if the defendant was in the company of the victim at or near the time of his death, this fact alone did not justify an inference that he killed the defendant; rather, it merely raised a conjectural suspicion which was in and of itself insufficient to convict. Our Court also observed that the money found in the defendant's possession was just as plausibly explained by the withdrawal of his savings and gambling activities to which the witnesses testified, as it was that the money was taken from the victim, particularly since the money found in defendant's possession was never identified as belonging to the victim.

As to the question of whether the defendant was in Chester County on the night of the murder, or in New York as he claimed, our Court found the evidentiary value of

the evidence allegedly furnished by the defendant in his statement to the detectives was considerably attenuated by the defendant's poor understanding of the English language. Additionally, our Court determined from scrutinizing the testimony of the Commonwealth's witnesses that there was a likelihood that they had the dates wrong as to when they observed the defendant in Chester County, which, in our Court's view, called their reliability into question; whereas our Court considered the testimony of the defendant's witnesses placing him in New York to suffer no such infirmity of credibility. Our Court found the inference that the defendant was in New York, as he claimed, to be bolstered by the uncontradicted evidence that the defendant shipped all of his clothes to New York on Thursday, supporting the inference that he knew he would be departing soon thereafter, and also the uncontradicted fact that his landlady heard someone exiting the building early Friday morning near the time the defendant claimed he had left for New York.

Critically, our Court found the Commonwealth's central theory of the case — that only the defendant had the opportunity to kill the victim as he was the last one to be with the victim before he was found dead, and, thus, no one else could have committed the crime — was unsupported by the evidence, inasmuch as the Commonwealth failed to prove that the defendant was the *only* person with the exclusive opportunity to kill the victim. In this regard, we emphasized that:

> All the circumstances proved by the Commonwealth are consistent with the theory that some person as yet unknown entered [the victim's] habitation on the morning of June 24th and killed him . . . . It was not necessary for this defendant, in order to be acquitted, to identify the unknown [person] who may have committed this murder. It was the duty of the Commonwealth in order to obtain the accused's conviction to show circumstances that are consistent only with the hypothesis of his guilt.

*Woong Knee New*, 47 A.2d at 467-68. Our Court also found the Commonwealth's desired inference further undercut by the fact that, despite the savagery of the crime, no blood or other evidence was found on defendant's clothing, and no other physical evidence established that the defendant was in the apartment at the time the victim was killed. Further, the forensic evidence introduced by the Commonwealth yielded an equally if not more likely conclusion that defendant was not in the apartment at any time that evening, given that the defendant's fingerprints were not found on the murder weapon or the half-consumed beer.  Nor was there any other evidence establishing the defendant's presence in the apartment, inasmuch as the hat was not shown to have been his, due to the fact the hair inside it was established to be the victim's. Our Court also pointed out that the defendant lacked a criminal record and the accompanying sophistication learned from past criminal enterprises to conceal his crime through the use of gloves.

Because the evidence supporting the inference of the defendant's guilt was in equipoise with the evidence supporting the conclusion that the defendant did not commit the offense, we held that, in this admittedly rare situation, the Commonwealth failed to meet its requisite burden of establishing the defendant's guilt beyond a reasonable doubt.  We articulated the parameters of this principle, thusly:

> When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a [finder of fact] must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty.  When a party on whom rests the burden of proof in either a criminal or a civil case, offers evidence consistent with two opposing propositions, he proves neither.

*Id.* at 468.

In the time since our *Woong Knee New* decision, our Court has likewise reversed convictions on the grounds the evidence was insufficient, as a matter of law, to establish the defendant's guilt of the offense charged where the entirety of the evidence adduced at trial, viewed in a light most favorable to the Commonwealth, yields competing ultimate inferences equally consistent with the defendant's innocence as with his guilt, thereby rendering the factfinder's guilty verdict the product of surmise or conjecture. *See*, *e.g.*, *Bausewine*, 46 A.2d at 493 (reversing defendant's conviction on the grounds of evidentiary insufficiency, as "[t]he facts shown were consistent with defendant's innocence, and could reasonably be explained on a theory other than that of guilt"); *Commonwealth v. Garrett*, 222 A.2d 902, 905 (Pa. 1966) (evidence insufficient to sustain defendant's robbery conviction since it established only that defendant was in the company of four individuals, one of whom robbed a pedestrian, and defendant was found and arrested in the vicinity of the robbery immediately thereafter, and defendant gave a written statement admitting to committing other crimes and being with the group prior to the robbery, but disclaimed participation in the robbery; thus inference that he participated in the robbery was "no more cogent than the version of the events contained in his statement"); *Commonwealth v. Tribble*, 467 A.2d 1130 (Pa. 1983) (where Commonwealth's evidence showed that defendant's fingerprints were on trucks which had been broken into, but evidence of record also showed that defendant had been in regular physical contact with the trucks as part of his employment, the evidence, as a whole, yielded two mutually inconsistent inferences — that defendant transferred the fingerprints while breaking into the truck, or that he did so on a previous occasion while working — hence it was insufficient to sustain defendant's conviction).

Although our Court has always conducted sufficiency review in accordance with the beyond a reasonable doubt standard, until the late 1970s, we did so as an extension

of our Commonwealth's long established common law principles, and we had not, prior to that time, formally recognized any constitutional underpinnings for it in our jurisprudence. However, in 1979, the United States Supreme Court, in *Jackson v. Virginia*, 443 U.S. 307 (1979), established that a criminal conviction must be supported by sufficient evidence, i.e., "evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense," in order to ensure that it did not violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution. The high Court viewed this requirement to be necessary in order to give full effect to its prior holding of *In re Winship*, 397 U.S. 358 (1970), that the requirement that an accused be convicted at trial on proof beyond a reasonable doubt, though derived from the common law, was, also, a constitutional guarantee afforded every defendant under the Due Process Clause of the Fourteenth Amendment.

The Court explained its rationale for recognizing that appellate sufficiency review of a criminal conviction is governed by the Due Process Clause:

> The *Winship* doctrine requires more than simply a trial ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence. A "reasonable doubt," at a minimum, is one based upon "reason." Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, and the same may be said of a trial judge sitting as a jury . . . . Under *Winship,* which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such a conviction occurs in a state trial, it cannot constitutionally stand.

*Jackson,* 443 U.S. at 316-18 (footnotes and citations omitted).

The high Court then held that an appellate court must, at a minimum, apply the following standard in order to ensure that a criminal conviction does not violate the Due Process Clause of the Fourteenth Amendment:

> [The appellate court must determine] whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

*Jackson,* 443 U.S. at 318-19 (citations and footnotes omitted) and (emphasis original).

After *Jackson*, the high Court reiterated that this standard of review is the *minimum* standard for sufficiency review necessary to comport with the Due Process Clause. *See Tibbs v. Florida*, 457 U.S. 31, 45 (1982) ("The Due Process Clause . . . sets a lower limit on an appellate court's definition of evidentiary sufficiency."). As our Court has previously recognized, because *Jackson* sets only a minimum federal constitutional standard for sufficiency review, "states may, of course, under their own laws or constitution, elect to utilize a different more stringent standard of sufficiency review." *Commonwealth v. Brown*, 52 A.3d 1139, 1164 (Pa. 2012); *see, e.g., Hale v. State*, 31 S.W.3d 850 (Ark. 2000) (declining to adopt *Jackson* and continuing to

following its traditional requirement under state law that there be "substantial evidence" to support a criminal conviction).

Jackson therefore did not effectuate a sea change in Pennsylvania law, inasmuch as our Court's standard of sufficiency review at the time Jackson was decided was already utilizing a substantially similar analytical framework. *See Commonwealth v. Long,* 368 A.2d 265 (Pa. 1977) ("[I]n evaluating the sufficiency of the evidence after a guilty verdict, all of the evidence, be it direct or circumstantial, must be read in a light most favorable to the Commonwealth, and the Commonwealth must be given the benefit of all reasonable inferences arising therefrom. But, before a conviction will be sustained, 'the facts and circumstances proved must be of such a character as to establish guilt beyond a reasonable doubt.'"). *Jackson* was significant, however, in that it transformed our common law standards for sufficiency review to irreducible federal constitutional mandates. As we have previously recognized, our current oft-articulated standard of review of a sufficiency-of-the-evidence claim, set forth *infra*, likewise provides a convicted defendant with the due process protections mandated by *Jackson*. *See Brown*, 52 A.3d at 1164-65 (explaining the parallels between our standard of review of evidentiary insufficiency and the *Jackson* formulation).

This standard of review is applicable to appellate review of juvenile delinquency adjudication. *In re Johnson*, 284 A.2d 780, 781 (Pa. 1971). We, therefore, evaluate J.B.'s sufficiency claim in the instant matter in accordance with our present standard of review which inquires "whether the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, supports the [factfinder's] finding that every

element of the offense was proven beyond a reasonable doubt." *Commonwealth v. Hicks*, 156 A.3d 1114, 1123 (Pa. 2017).[10]

In conducting this review, "the entire record must be evaluated and all evidence actually received must be considered." *Commonwealth v. Ratsamy*, 934 A.2d 1233, 1236, n.2 (Pa. 2007); *see also Commonwealth v. DeMoss*, 165 A.2d 14, 16 (Pa. 1960) ("In determining the sufficiency of the evidence to sustain [the defendant's] conviction it is our duty to examine and scrutinize in detail *all* the evidence in this record and to attempt to place in juxtaposition each act, scene and character in this macabre drama" (emphasis original)).

When examining the evidence in the trial record in a light most favorable to the Commonwealth, we do not make new factual determinations based on the trial evidence introduced; rather, we accept the evidence of record, and all reasonable inferences drawn therefrom on which the factfinder could properly have based its verdict, as factually true. *Commonwealth v. Erney*, 698 A.2d 56, 58 (Pa. 1997).[11] If the evidence of record viewed in the light most favorable to the Commonwealth, as well as all reasonable inferences derived therefrom, does not establish the defendant's guilt beyond a reasonable doubt of any element of the offense for which he was tried, then the evidence is insufficient to sustain the defendant's conviction as a matter of law, and he must be discharged. *Commonwealth v. Hart*, 28 A.3d 898, 912 (Pa. 2011). The

---

[10] Because evidentiary sufficiency is a pure question of law, our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Sanchez*, 36 A.3d 24, 37 (Pa. 2011).

[11] As a general proposition, an inference in a criminal prosecution used to establish a defendant's guilt cannot be considered reasonable, and thus comport with the Due Process Clause of the United States Constitution, unless the inference is "more likely than not to flow from" the basic facts proven by the prosecution on which the inference is founded. *County Court of Ulster v. Allen*, 442 U.S. 140, 165 (1979).

equipoise principle our Court applied in *Woong Knee New*, *Tribble*, and our related jurisprudence discussed *supra*, is wholly consistent with these precepts. Thus, if the trial evidence of record viewed in the light most favorable to the Commonwealth and all reasonable inferences drawn from that evidence is only, at most, equally consistent with a defendant's innocence as it is with his guilt, the Commonwealth has not sustained its burden of proving the defendant's guilt beyond a reasonable doubt.[12]

## IV. Arguments of the Parties

With these legal precepts in mind, we turn to J.B.'s claim that the evidence of record from his adjudicatory hearing, and the reasonable inferences therefrom when viewed in a light most favorable to the Commonwealth, were insufficient to sustain his conviction for first-degree murder. As we have frequently stated, evidence is sufficient to sustain a conviction for first-degree murder when the Commonwealth establishes, beyond a reasonable doubt, "that a human being was unlawfully killed, the defendant perpetrated the killing, and the defendant acted with malice and a specific intent to kill." *Commonwealth v. Johnson*, 160 A.3d 127, 136 (Pa. 2017); 18 Pa.C.S. § 2502(a). J.B. contests the sufficiency of the evidence supporting the second requirement for a homicide conviction — the juvenile court's finding that he was the individual who killed K.M.H. and her unborn child on the morning of February 20, 2009.

---

[12] We have also held that the evidence in the trial record, viewed in a light most favorable to the Commonwealth as well as all reasonable inferences derived therefrom, can be so unreliable or contradictory that it is insufficient as a matter of law to convict. In such circumstances, the Commonwealth does not meet its burden of proof beyond a reasonable doubt, because the evidence and all reasonable inferences rise no further than mere suspicion or conjecture. *See Commonwealth v. Karkaria*, 625 A.2d 1167 (Pa. 1993) (reversing defendant's conviction for sexual assault of his stepsister on sufficiency grounds, because the victim, the Commonwealth's chief witness, gave unreliable and contradictory testimony as to how and when the assaults occurred).

J.B. principally argues that the evidence was insufficient to sustain his conviction because the juvenile court relied on weak and inconclusive forensic evidence to reach conclusions that such evidence did not support. First, J.B. highlights the fact that, in his view, the evidence of record did not support the juvenile court's conclusion that the .20 gauge shotgun recovered from the upstairs bedroom was the murder weapon. In this regard, J.B. initially notes that the .20 gauge shotgun shell, which was recovered from an area in which he and his father had routinely shot such weapons on previous occasions, was found buried under ice and leaves, raising doubt as to whether it had been fired from the shotgun on the day of the murder. Further, J.B. points out that the Commonwealth's firearms expert could not directly link the pellets recovered from the victim's body to the shotgun taken from J.B.'s room, inasmuch as the tests which he ran showed, at most, that the pellets recovered from the victim's skull were "consistent" in their size, shape, weight, and material with the pellets in an unfired shotgun shell located inside the armoire. Appellant's Brief at 17.

J.B. calls attention to the fact that only 27 pellets were recovered from the victim's body during the autopsy, yet the type of .20 gauge shotgun shell which Trooper Burlingame used for comparison purposes contains 225 pellets. Additionally, J.B. notes the absence of any blood or tissue residue on the inside of the shotgun, or on its frame, even though the forensic pathologist testifying on behalf of the Commonwealth indicated only that the amount of blowback would be "less" due to the angle of the entry wound, suggesting that there would be at least some blowback if a shotgun was discharged in such close proximity to the back of the victim's head. *Id.* at 19. Further, J.B. stresses that there were no fingerprints or DNA evidence found on the shotgun or the spent shell. J.B. also claims that the trial court disregarded the significant fact that there was no

blood or biological material found on his clothing, which was the same clothing that he wore the morning of the shooting.

Turning to the juvenile court's conclusion that the evidence showed that there was a large volume of gunshot residue present on Appellant's clothing, which, in its view, established that he fired the shotgun on the morning of the crime, J.B. points out this is contrary to what the Commonwealth's expert Elena Somple testified to, as she related that she found only one particle of residue. Moreover, Somple could not say definitively how this residue got onto J.B.'s clothing and noted that such residue could linger for months after a firearm was discharged and be transferred from one article of clothing to another. J.B. contends that the evidence of record showed that this alternate means of transfer was a likely means of explaining how such residue got on his jeans given that the evidence showed he had only one winter coat, which he wore all the time, and that he wore the coat to a turkey shoot the preceding weekend.

J.B. also maintains that the trial court's conclusion that, because there was no evidence of forced entry into the home, nor any ransacking thereof, this furnished proof that he was the perpetrator. J.B. points out that the evidence showed that the victim was found in bed and was shot from behind; and, given that the doors to the house were unlocked and 48 minutes had elapsed between the time the children left for school and the tree cutting crew arrived, an assailant could have entered the home without the victim knowing and shot her while she was lying in bed. J.B. concludes by arguing that none of the facts upon which the trial court relied, even taken together, overcame his presumption of innocence.

The Commonwealth responds by contending that the evidence establishes that the .20 gauge shotgun in the residence was the only one which smelled as if it had been recently fired, and the pellets and wadding from the victim's wound were consistent with

the unfired .20 gauge shotgun shells found in the victim's bedroom, as was the pristine .20 gauge shell found outside. The Commonwealth notes that the juvenile court found that J.B. was present in the residence on the morning of the crime, was only one of three people with firsthand knowledge of the weapon's location, had access to the weapon and the ammunition, and that his clothing tested positive for gunshot residue. Because J.B. had the time and opportunity to shoot his stepmother and then discard the shell along the driveway as he made his way to the school bus, all of these factors, in the Commonwealth's view, were sufficient to establish that J.B. was the one who fired the fatal shot. The Commonwealth submits that this conclusion is further supported by the fact that none of the investigating troopers found any signs of forced entry, and the observations of the condition of the snow in the driveway made by the tree service employee who called the police on the morning the body was discovered established that no one traveled up the driveway between the time the children left for school and the time he and his crew arrived, particularly since the driveway was the only means of access to the property.

## V. Analysis

As developed by the parties, the primary factor relied on by the juvenile court to adjudicate J.B. as delinquent was its finding that the .20 gauge shotgun recovered from J.B.'s room was "established to be the murder weapon." Juvenile Court Opinion, 5/19/15, at 39. However, the evidence of record which the Commonwealth presented on this issue, even when accepted as true, did not make this the only reasonable inference which could be drawn therefrom.

First, the Commonwealth's expert firearms examiner, Paul Burlingame, testified that smooth bore shotguns, unlike rifles or pistols, have no unique grooves in their barrels, and, hence, they do not produce any identifying marks on shotgun shell pellets

discharged from a particular shotgun. As a result, he could not perform an individualized comparison analysis of the pellets which were recovered from the victim's body with the pellets in the box of shells located in the armoire; nor did he, alternatively, perform any comparative metallurgical analysis of the two groups of pellets which could have established whether they came from the same manufacturer and the same batch of pellets. N.T. Adjudication Hearing, 4/11/12, at 42-43. The extent of his expert opinion in this regard was only that the pellets recovered from the victim's body were "consistent" with the pellets in the box of unfired shells, *id.* at 45 – an unremarkable conclusion, given that such a finding could be made any time two groups of pellets from any two .20 gauge shotgun shells are compared. Consequently, it appears this evidence reasonably supports only the inference that the pellets *could* have come from any commercially available .20 gauge shotgun shell, but it is not reasonable to infer that they could have *only* come from the box of shells found in the armoire. *See, e.g., Long*, 368 A.2d at 267 (expert testimony that pieces of forensic evidence found at the crime scene and on the defendant's person were merely "consistent with" one another is not proof beyond a reasonable doubt that they originated from the same source).

Second, the juvenile court supported its finding that the .20 gauge shotgun recovered from J.B.'s room was the murder weapon because the state police officers who examined it opined that it "smelled" as if it had been recently fired. However, this testimony did not reasonably support the sole inference that the shotgun had been fired on the morning of the murder, inasmuch as both officers acknowledged they were not offering an expert opinion on when the shotgun had been fired, and, in fact, admitted they could not determine with any degree of scientific certainty exactly when the shotgun had been fired based on its smell. N.T. Adjudication Hearing, 4/10/12, at 130. Given the scant utility of the troopers' testimony in determining when the shotgun had

last been fired, the testimony of J.B.'s father, that J.B. had repeatedly fired this weapon at a turkey shoot in an indoor facility less than a week before it had been seized from his room, which was confirmed by the state police, yields an equally likely inference that the shotgun odor lingered from its use at the turkey shoot.

In point of fact, the trial evidence introduced through the Commonwealth's witnesses and accepted as true supported an equally reasonable conclusion that this .20 gauge shotgun was *not* the murder weapon: First, the forensic pathologist concluded that the shotgun which delivered the lethal blast to the victim was discharged from a distance of less than two inches from her neck, and, second, the barrel of the gun was in close proximity to the victim's skin at the time of discharge; however, when the .20 gauge shotgun retrieved from J.B.'s room was examined by the state police crime laboratory, no blood, skin, or other biological material was detected in the interior of the shotgun barrel, on the exterior of the barrel, or on the frame of the weapon.

Although the juvenile court and two of the three judges on the Superior Court panel below placed great emphasis on the testimony of the forensic pathologist, Dr. Smith, that the amount of this blowback of blood and other tissue would be minimized by the angle of the wound, critically, as argued by J.B., Dr. Smith, in his testimony, did not rule out the possibility of blowback. Indeed, Dr. Smith found during his examination of the victim that the vast majority of the shotgun pellets had, after encountering the bones of the victim's skull, rebounded backwards towards the direction of their entry and became lodged in the back of the victim's neck. *Id.* at 162. Dr. Smith agreed that the shot which entered the back of the victim's head could have, upon impacting the bones of the skull, caused tissue and blood to be propelled back through the channel created by the shot and into the barrel of the gun, and he opined that it was plausible

under these circumstances that there would have been blowback. *Id.* at 170-72, 191-92.

To explain the absence of such residual evidence, the Commonwealth theorizes that J.B. may have wiped the gun clean of any such evidence after he used it to commit the murder, but this is a wholly speculative assertion which is not supported by any evidence of record. Indeed, the evidence of record regarding the time frame in which the events of that morning unfolded raises serious questions as to whether J.B., then 11, would have had sufficient time to perform such a thorough cleaning of the murder weapon in order to eliminate all traces of forensic evidence prior to his catching the school bus. Further, when J.B. was arrested, he was still wearing the clothes that he wore to school on the morning of the shooting. Despite the undisputed fact that the murder weapon was discharged when it was almost touching the victim's head, and the large quantity of blood lost by the victim as a result from the wound, when J.B.'s clothes were tested, no blood stains or other biological material was found on them. N.T. Adjudication Hearing, 4/11/12, at 132-34.

The juvenile court coupled its conclusion that the shotgun recovered from J.B.'s room was the murder weapon with its other findings: that only a limited number of people knew where the .20 gauge shotgun recovered from J.B.'s room was kept; that J.B. knew how to handle a shotgun; that he had a large amount of gunshot residue on his clothes which he was wearing on the day of the murder; the presence of an unweathered .20 gauge shotgun shell found the day after the murder near the driveway which J.B. walked down on his way to catch the school bus; the fact that only J.B., the victim, and the victim's children were present in the family home after J.B.'s father left for work; and the lack of evidence of any forced entry to the family home. The court concluded these facts, taken together, support its ultimate determination that the

evidence was sufficient to convict J.B. beyond a reasonable doubt of the murders. We disagree.

We note that J.B.'s knowledge of where his own shotgun was stored becomes relevant to the question of his guilt only if the juvenile court's conclusion that this particular shotgun was the murder weapon was adequately founded on the evidence of record. However, for the reasons discussed above, the evidentiary record does not make the juvenile court's inference – that this was, in fact, the murder weapon – more likely than the equally reasonable inference that it was not, and hence it establishes, at most, two equally contrary conclusions.

Once the juvenile court concluded that the shotgun was the murder weapon, that court examined the other evidence which it viewed as establishing beyond a reasonable doubt that J.B. used it in the commission of the murder. First, the court inferred that J.B. knew how to handle a shotgun because he had previously fired shotguns with his father. This fact, in and of itself, however, does not reasonably lead to the exclusive inference that J.B., as an 11-year-old boy, had the requisite skills in handling such weapons to kill the victim in the manner in which the Commonwealth postulated she was slain. Indeed, the uncontroverted evidence presented at the adjudication hearing establishes that J.B.'s abilities to operate his shotgun were limited. His father recounted that, at the turkey shoot, J.B. could not independently load the shotgun, and that he had to load and unload the gun for J.B. each time he fired it. N.T. Adjudication Hearing, 4/11/12, at 145. Thus, an equally plausible inference which can be drawn from this undisputed evidence is that J.B. lacked the capability to surreptitiously retrieve the shells from the armoire, quickly load them into the shotgun, and fire one lethally precise shot into the victim in the calculated and efficient manner which the Commonwealth contended he acted.

The juvenile court next heavily relied on the fact that two particles of gunshot residue, and various one component or two component particles of lead, bismuth, and antimony — the three chemical elements which, when joined together, comprise such residue — were found on J.B.'s shirt and pants in sufficient quantity to infer that such particles could only have been deposited there by his firing of a shotgun on the morning of the victim's death. However, this evidence, at best, supports only a lesser, more equivocal inference. Although the juvenile court and Superior Court opinions place great emphasis on the numbers of "single component," or double component, components of gunshot residue found on defendant's clothes, the mere presence of such particles does not scientifically establish that they originated from the discharge of a firearm. As the Commonwealth's expert, Semple, specifically noted in her testimony, such single or double component particles "could come from other sources." *Id.* at 10.

Moreover, Semple provided unrebutted testimony that gunshot residue can be deposited on clothing if it "came into contact with something that had gunshot residue on it." *Id.* at 21. The record establishes that, on the day of his arrest, J.B. was wearing, over his clothing, the jacket he wore while shooting his gun at the turkey shoot a week earlier. Semple explained that the presence of gunshot residue on clothing can have enduring longevity, noting: "[i]f I discharged a firearm and took my clothes off, put them in the corner of my room and they were undisturbed for a month, two months, a year, and then tested those clothes, you could still find gunshot residue on them." *Id.* at 23. Additionally, Semple observed that, when a gun is discharged inside of an enclosed structure like a house, one would expect to find "a lot of gunshot residue," due to the large cloud of particles of gunshot residue generated by the firing of the weapon and the lack of airflow to disperse that cloud. *Id.* at 28. This evidence, presented through the Commonwealth's own expert witness, therefore, reasonably supports at least an equally

likely inference that the two particles of gunshot residue were deposited on J.B.'s clothing through means other than the firing of his shotgun inside the victim's room.

Additionally, the juvenile court determined that a spent shotgun shell found by investigating officers early in the morning the day after the murder, along the fence line running parallel to the driveway down which the children walked on their way to catch the school bus, reasonably supported an inference that this was the shell J.B. had used in the murder, and that he had discarded it on the way to the bus in an effort to conceal it. The juvenile court's determination rested on the apparently un-weathered condition of the shell and the fact that it was of the same general type as the unused shells found in the box in the armoire. However, once more, other uncontradicted evidence of record reasonably supports an equally strong inference that the shell was not discarded by J.B. on the morning of the murder.

First, the shell was found in a location where J.B. and his father routinely fired their weapons during target practice, and there were other older shells of the same type found nearby on the property. N.T. Adjudication Hearing, 4/11/12, at 142. Second, when the spent shell was discovered by the investigating officers, it was buried *underneath* frozen leaves, which were, in turn, covered by ice and snow, thereby diminishing the likelihood that it had attained that position by having been thrown there by J.B. the previous day during his walk to the bus. *Id.* at 210. Importantly, the uncontroverted testimony of the school bus driver, who observed J.B. and his sister for the entire time they were walking toward the bus, was that he did not observe J.B. throw anything away during his journey, or leave the driveway. N.T. Adjudication Hearing, 4/10/12, at 154, 156. Thus, all of this evidence, accepted as true, supports the equally reasonable inference that the shell had been deposited there at some time prior to the

day of the shooting, and that it was not the shell which was used in the killing of the victim.

Finally, the evidence that J.B., the victim, and the victim's children were present in the family home after J.B.'s father left for work, and the lack of evidence of any forced entry to the family home, does not yield the sole reasonable inference that J.B. was the murderer. As we have held, mere presence at the scene of a murder before, or even during its commission, does not establish sufficient evidence of a defendant's guilt of that offense. *Woong Knee New*, *supra*. Additionally, the apparent lack of evidence of forced entry does not, as the juvenile court suggests, lead only to a reasonable inference that no one entered the home after the children departed for school. Notably, the evidence of record was uncontradicted that the home was unlocked, including the front door near the victim's bedroom, which was found to have blood on its frame, and, after J.B. and his sister departed for school, a full 45 minutes elapsed before the tree cutting crew arrived at the premises. This afforded a sufficient amount of time for an intruder to surreptitiously enter the premises of the farmhouse, kill the victim, and then leave.[13]

Most critically, however, a reasonable inference that J.B. was not the person who fired the lethal shotgun blast which killed the victim can be drawn from a key and

---

[13] As set forth above, the evidence was equivocal on the existence of tire tracks in the driveway at the time Cable arrived on the premises to begin work; additionally, the evidence of record showed, contrary to the Commonwealth's contention, the house was accessible from the road by foot as well, and there was no evidence regarding the existence or absence of footprints around the house. Moreover, and most importantly, as we stated in *Woong Knee New,* "[i]t was not necessary for this defendant, in order to be acquitted, to identify the unknown [person] who may have committed the murder. It was the duty of the Commonwealth in order to obtain the accused's conviction to show circumstances that are consistent only with the hypothesis of his guilt." 47 A.2d at 467-68.

unrebutted evidentiary factor — the fact that J.B.'s 7-year-old stepsister J.H. was present in the home with J.B. the entire morning on the day of the murder before they left for school. Had J.B. discharged his shotgun inside of the family home, as the Commonwealth claims, it is reasonable to conclude that the cacophonous noise from the discharge would have been heard by J.H., who was downstairs on the first floor of the home watching TV in the room near where the victim was murdered. Yet, when J.H. was questioned later that morning at school by Trooper Wilson, she recounted nothing out of the ordinary regarding what transpired at home, and, notably, she did not testify at J.B.'s adjudication hearing on behalf of the Commonwealth. Likewise, the school bus driver who observed both J.B. and J.H. on the morning of the murder observed nothing unusual about how the children were acting; rather, he remembered they behaved as they did every other morning when he picked them up. N.T. Adjudication Hearing, 4/10/12, at 152-62. This evidence therefore gives rise to the equally reasonable inference that J.B. did not use his shotgun inside the farmhouse to kill his stepmother.

In sum, then, all of the Commonwealth's forensic and eyewitness testimony, and all reasonable inferences derived therefrom, viewed in a light most favorable to it, was, at best, in equipoise, as it was equally consistent with two possibilities: first, that a person or persons unknown entered the house in which J.B.'s stepmother was sleeping and shot her to death after J.B. and his sister had left for school on the morning of February 20, 2009; second, the Commonwealth's theory that, after J.B.'s father left for work, J.B., in full view of J.H., walked upstairs and retrieved a .20 gauge shotgun from his bedroom, walked back downstairs, retrieved a shotgun shell from a box of shells located in an armoire in the victim's bedroom on which the television set she was watching was located, shot the victim in the back of the head as she lay on the bed facing that television, took the shotgun back upstairs and returned it to its former

position — after wiping it clean of any physical evidence caused by the shooting — then caught the school bus with J.H., and went to school as if it were any other normal morning. The Commonwealth's evidence was, therefore, insufficient as a matter of law to overcome Appellant's presumption of innocence, and the juvenile court's adjudication of his delinquency for these serious crimes must be reversed. *See Woong Knee New,* 47 A.2d at 468 ("When a party on whom rests the burden of proof in either a criminal or a civil case, offers evidence consistent with two opposing propositions, he proves neither."); *Tribble*, 467 A.2d at 1132 ("[S]ince the testimony presented by the Commonwealth to establish appellant's guilt is at least equally consistent with appellant's innocence, there is insufficient evidence to sustain appellant's conviction.").[14]

The order of the Superior Court affirming the juvenile court's order of disposition is reversed, Appellant's adjudication of delinquency is vacated, and Appellant is discharged.

Chief Justice Saylor and Justice Dougherty join the opinion.

Justice Mundy files a concurring opinion in which Justice Baer joins.

Justices Donohue and Wecht did not participate in the consideration or decision of this case.

---

[14] Given our disposition of Appellant's sufficiency of the evidence claim, we need not address his weight of the evidence claim.