J-A08008-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
:
ALAN H. COBURN :
:
Appellant : No. 1370 EDA 2019

Appeal from the Judgment of Sentence Entered April 29, 2019
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0002686-2018

BEFORE: LAZARUS, J., KUNSELMAN, J., and McCAFFERY, J.

MEMORANDUM BY LAZARUS, J.: **FILED SEPTEMBER 09, 2020**

Alan H. Coburn appeals from the judgment of sentence, entered in the

Court of Common Pleas of Montgomery County, following his convictions after

a bench trial for driving under the influence (DUI)[1] and the summary offense

of disregarding a traffic lane.[2] After careful review, we affirm.

The trial court described the facts of the case as follows:

During the early morning hours of September 10, 2017, Trooper
Jason Henley [] of the Pennsylvania State Police Skippack
Barracks was on patrol with his partner, Corporal Jonathan
Meister[,] [] in Upper Salford Township, Montgomery County. At
approximately [1:30 a.m.], the two state troopers were traveling
west on Route 63 when a white Chevy Camaro in the eastbound
lane crossed over the center line into the westbound lane, towards
the patrol vehicle, before abruptly swerving back into its proper
lane of travel. At that point, [Corporal] Meister turned his vehicle
around and [] follow[ed] the white vehicle. Based on [Trooper]

---

[1] 75 Pa.C.S.A § 3802(d)(2).

[2] 75 Pa.C.S.A § 3309(1).

Henley['s] and [Corporal] Meister's observation of that vehicle's break light's constant illumination and its reckless conduct in swerving over the white line onto the shoulder and then back over the center line into the opposite lane, the two state troopers reasonably believed the driver [(subsequently identified as Coburn)] could be under the influence and proceeded to conduct a vehicle stop. During the stop, [Coburn's] cognitive abilities appeared to be impaired; he had trouble answering simple questions and [] could not immediately remember from where he was driving. Given [Coburn's] extreme confusion, lethargic movements, slurred speech, and failure to successfully pass field sobriety tests, [Trooper] Henley determined, based on his experience and training, that [Coburn] was unable to safely operate a vehicle that night and proceeded to place him under arrest for driving under the influence.

A blood test performed on a sample taken from [Coburn], about an hour after the police stop, detected the presence of Zolpidem (commonly known by its brand name, Ambien) in [Coburn's] system at the time he was driving. The drug Zolpidem is a sedative hypnotic, prescribed to individuals who suffer from insomnia or have trouble staying asleep, and it comes with the recommendation that one should have eight [] hours to dedicate to a sleeping period before ingesting the drug. At trial, [Coburn] admitted to taking a prescribed dose roughly six [] hours before his arrest. [Doctor] Laura Labay [] opined on behalf of the Commonwealth that Zolpidem, at the concentration found in [Coburn's] blood, is not compatible with the safe operation of a motor vehicle[.]

\* \* \*

[Also at trial, Coburn testified] that he dozed off on the night in question, something he said [had] happened six [] or seven [] times in the past. In addition, during [Coburn's] direct examination, the [c]ourt sustained the Commonwealth's objection to the relevancy of his testimony concerning events that transpired weeks after [Coburn's] arrest on the underlying charges:

Defense Counsel: What would happen?

[Coburn]: I would be driving down the road, and I'd just doze off.

Defense Counsel: How many times did that occur?

[Coburn]: Probably around six, seven times.

Defense Counsel: Did it occur that night?

[Coburn]: Yes.

Defense Counsel: [Y]ou heard the trooper say that the car swerved?

[Coburn]: Yes.

Defense Counsel: Is that why it swerved?

[Coburn]: Yes.

Defense Counsel: Did it happen after that?

[Coburn]: No.

Defense Counsel: Did you hit a parked car four or five days after that?

[Coburn]: Yes.

Defense Counsel: Why did you hit a parked car?

[Coburn]: That was the last night it happened.

Defense Counsel: Did the police come?

[Coburn]: Yes.

Defense Counsel: Did you see a doctor after that?

[Coburn]: Yes. The officer wanted me to go to the hospital that night to see if I hit my head.

Defense Counsel: Why?

[Coburn]: So I went to the hospital, and they withdrew my blood.

The Commonwealth: Objection. Relevance.

The Court: Sustained.

Defense Counsel: After a visit to the doctor, did the state take your license for medical purposes?

The Commonwealth: Objection. Relevance.

Defense Counsel:  Your Honor, during this time period-

The Commonwealth:  This is weeks after that time period.

The Court:  Sustained.

Defense Counsel:  Did you go [to] the Entity Sleep Wellness Center?

[Coburn]:  Yes.

Defense Counsel:  Were you treated there?

[Coburn]:  Yes.

Defense Counsel: How long a time period?

[Coburn]:  It was a couple months.

Trial Court Opinion, 8/8/19, at 1-4 (quoting N.T. Trial, 4/29/19, at 69-70) (footnotes omitted).

Following his convictions, the court sentenced Coburn on April 19, 2019, to six months' intermediate punishment—the first seventy-two hours were to be served on house arrest.  Coburn timely appealed.  Coburn and the trial court then complied with Pa.R.A.P. 1925.

On appeal, Coburn raises the following issues for our review:

1. Was the evidence insufficient as a matter of law for the court to convict [] Coburn of 75 Pa.C.S.[A.] § 3802(d)(2) DUI/Unsafe [d]riving-[c]ontrolled [s]ubstance[,] when there was a reasonable alternative hypothesis of the circumstantial evidence adduced at trial that [] Coburn's erratic driving was caused by a medical condition, not the minute amount of Ambien in his system?

2. Did the trial court err in ruling evidence was irrelevant that tended to show that [] Coburn's erratic driving was caused by a medical condition unrelated to the Ambien in his system?

Appellant's Brief, at 2.

Our standard of review for an appellant's challenge to the sufficiency of the evidence is well-settled:

> We must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail.
>
> The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented. It is not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact[-]finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Olsen*, 82 A.3d 1041, 1046 (Pa. Super. 2013) (quoting

*Commonwealth v. Mobley*, 14 A.3d 887, 889-90 (Pa. Super. 2011)).

Coburn first challenges the sufficiency of the evidence supporting his conviction for driving under the influence, under 75 Pa.C.S.A. § 3802(d)(2), which states:

> An individual may not drive, operate or be in actual physical control of the movement of a vehicle under any of the following circumstances:
>
> * * *
>
> (2) The individual is under the influence of a drug or combination of drugs to a degree which impairs the individual's ability to safely drive, operate or be in actual physical control of the movement of the vehicle.

75 Pa.C.S.A. § 3802(d)(2). We have previously stated that section 3802(d)(2) "does not require proof of a specific amount of a drug in the driver's system. It requires only proof that the driver was under the influence of a drug or combination of drugs to a degree that the ability to drive is impaired." *Commonwealth v. Tarrach*, 42 A.3d 342, 345 (Pa. Super. 2012). Additionally, expert testimony is not required to prove a violation of section 3802(d)(2). *Id.*

As an initial matter, Coburn argues that the Pennsylvania Supreme Court has enunciated a "reasonable alternative hypothesis" sufficiency standard in the cases of *In the Interest of J.B.*, 189 A.3d 390 (Pa. 2018), and *Commonwealth v. Woong Knee New*, 47 A.2d 450 (Pa. 1946), which applies here, where the defendant's conviction is founded entirely on circumstantial evidence. *See* Appellant's Brief, at 29-40. Coburn additionally claims that he has a disability as a result of a leg injury he sustained at fifteen years of age, that he has had seventeen surgeries as a result of that injury, and that at the time of his arrest, Coburn was experiencing a reaction to the withdrawal of prescribed morphine, all of which caused his erratic driving and his lack of mobility. *See* Appellant's Brief, at 51. Coburn also states that he generally has a slow and "persistently abnormal flat affect." *Id.* at 22. Coburn argues that these factors explain his behavior at the time of his arrest; thus, the Commonwealth failed to prove his convictions beyond a reasonable doubt.

In ***In the Interest of J.B.***, our Supreme Court reversed the defendant's

murder conviction on grounds that the evidence was insufficient because the

Commonwealth's evidence was,

> at best, *in equipoise as it was equally consistent with two possibilities*:  first, that a person or persons unknown entered the house in which [the defendant's] stepmother was sleeping and shot her to death after [the defendant] and his sister had left for school []; second, the Commonwealth's theory that, [] [the defendant, an eleven-year-old], in full view of [his sister] walked upstairs and retrieved a .20 gauge shotgun from his bedroom, walked back downstairs, retrieved a shotgun shell from a box of shells located in an armoire in the victim's bedroom on which the television set she was watching was located, shot the victim in the back of the head as she lay on the bed facing that television, took the shotgun back upstairs and returned it to its former position—after wiping it clean of any physical evidence caused by the shooting—then caught the school bus with [his sister], and went to school as if it were any other normal morning. The Commonwealth's evidence was, therefore, insufficient as a matter of law to overcome [the defendant's] presumption of innocence, and the juvenile court's adjudication of his delinquency for these serious crimes must be reversed.  ***See Woong Knee New***, 47 A.2d at 468 ("When a party on whom rests the burden of proof in either a criminal or a civil case, offers evidence consistent with two opposing propositions, he proves neither."); [***Commonwealth v.***] ***Tribble***, 467 A.2d [1130,] 1132 [(Pa.  1983)] ("[S]ince the testimony presented by the Commonwealth to establish appellant's guilt is at least equally consistent with appellant's innocence, there is insufficient evidence to sustain appellant's conviction.").

***In the Interest of J.B.***, 189 A.3d at 422 (emphasis added).  The Supreme

Court explained that "the equipoise principle" discussed above is "wholly

consistent" with the "oft-articulated" sufficiency standard.  ***Id.*** at 414-15.

Thus, if the evidence "viewed in the light most favorable to the Commonwealth

and all reasonable inferences drawn from that evidence is only, at most,

equally consistent with a defendant's innocence as it is with his guilt, the Commonwealth has not sustained its burden of proving the defendant's guilt beyond a reasonable doubt." *Id.* at 415.

Here, Coburn challenges the element of causation within the DUI statute. Specifically, he claims that the Commonwealth's expert witness, Dr. Labay, failed to establish whether the amount of Zolpidem in Coburn's system was in the "therapeutic range" at the time he was driving, and that her testimony was equivocal on causation. *See* Appellant's Brief, at 43-45. We disagree.

At trial, Dr. Labay testified extensively and consistently. *See* N.T. Trial, 4/29/19, at 32-59. Her testimony on direct examination proceeded, in relevant part, as follows:

Q. Now, we were never able to provide you with the time frame that the defendant took the Ambien; correct?

A. I did not have that. I just had the time of the blood collection, and the police stop as about an hour earlier.

Q. So you can't tell us whether, at the time of the blood draw, he was in therapeutic range or not, because you don't have all of the information you need to go back in time and say, okay, if he took it four hours ago it would be at this level, if he took it an hour ago it would be at this level. You can't answer that question, based on—

A. No. I mean, the best that I would be able to do would be the concentration was reported at 43 nanograms per milliliter, and then compare that concentration to other concentrations that have been reported in the literature, with a certain dosage and time frame.

Q. **When you compared that dosage to the literature, what are some of the symptoms that you saw exhibited by the**

**defendant that were consistent with impairment from that particular drug?**

A. **Well, to me when I looked at the video, he looked not a hundred percent. It looked like there was some cognitive slow-down or impairment. It seemed to me that there was a delay when he would get asked a question and some of his responses. And then I remember seeing part of the video where he got put into the police car.** Did that get played?

Q. We played that[.]

A. **He just looked, like, sleepy to me.**

Q. Okay. Did you observe him swaying during the Romberg test?

A. I don't recall specifically during the Romberg test. **But I did remember when he was out of the vehicle just seeing a slight—I guess a sway. Very slight.**

* * *

Q. Can you tell us what you mean by that, when you say swayed?

A. **It just looked like he went a little bit sideways.** It wasn't necessarily like feet movement or stumbling or anything like that. But it just looked like, if you're told to stand up as straight as you can, just moving a little bit.

Q. Based upon all of the evidence that you reviewed in this case, are you able to come to an opinion as to whether the defendant, with the level of Ambien that he had in his system, [whether] his ability to safely drive was impaired?

A. **In my opinion—Zolpidem is a sleep aid. This concentration, depending upon when the measurement is made and how much dosage an individual took, can help promote sleep. And to me, Zolpidem, at this concentration, is not compatible with the safe operation of a motor vehicle, and I believe can contribute to an adverse [e]ffect that somebody sees, especially in the absence of another cause for that.**

Q. Your opinion as to the defendant's ability to safely drive, would it matter to you whether he was prescribed this medication in

[the] therapeutic range, or is that a non-factor when you come to your conclusion here?

A. Yeah. So part of knowing if a drug is prescribed and knowing how long somebody has been using a drug can speak to an individual's tolerance, because the more somebody uses a medication the more tolerant they become. But Zolpidem, for therapeutic purposes, is a sleep aid. So if you're at therapeutic with Zolpidem, you're supposed to be sleeping, ideally.

*Id.* at 35-38 (emphasis added). On cross-examination, Dr. Labay clarified her

testimony:

Q. Doctor, you said he didn't quite look like he was a hundred percent, a little bit slow. Is that what your testimony is?

A. Yes. And [for] the most part . . . what really stuck out in my mind when I watched the video was, I think after all the testing was done, when he was in the back of the police car.

Q. **[H]is ability to walk and turn had no play in your opinion?**

A. **No. You know, for me—so there's the statement concerning erratic driving, crossing over the middle line into oncoming traffic, and then going back, and then inability to maintain lane position. So, to me, that's an indicator of erratic driving.** And then—so then there's the field sobriety testing. But I did hear that Mr. Coburn has the leg problem—or a leg problem. So, to me, maybe the field sobriety test, the components that require [Coburn] to have normal leg function, maybe there's less weight there. **But then, to me, it's the erratic driving, it's the way he looked when he got into the back of the police car. It looked like a slight sway. And then the next step is to see if there's a drug in his system that can [] account for that behavior—and then we find Zolpidem, which is a sleep aid. So, to me, it's everything together.**

\* \* \*

Q. And because he had a sleep aid in his system, that's the major part of your opinion?

- 10 -

> A. **Well, my opinion is that analytical testing found Zolpidem at 43 nanograms. And my opinion also relies on what Zolpidem is prescribed for and used for.**

*Id.* at 39-51 (emphasis added). In sum, Dr. Labay testified that Zolpidem is a sleep aid, and that, based on the literature she reviewed, Coburn's blood measurement of 43 nanograms per milliliter could "promote sleep," and "can contribute to the adverse [e]ffect[s]" which she described as Coburn's erratic driving, cognitive slow-down, and sway.

> Coburn argues:
>
> > [W]hat Dr. Labay actually opined was that depending on when the blood measurement was taken relative to when [] Coburn took the drug, the amount of Ambien in his system could be consistent with a therapeutic concentration of the sleep aid, and if his blood was at a therapeutic concentration that "can contribute" to the sleepy affect and the swaying Dr. Labay sees in the video, "especially in the absence of another cause for that." ***See also id.*** at 57 ("I would say Zolpidem is a medication prescribed as a sleep aid, it's a sedative hypnotic. 43 nanograms per [milliliter], as far as I know, **can potentially be consistent with a therapeutic concentration**.")[.] It must be remembered that Dr. Labay was never provided with any indication that there is, in fact, another cause for [] Coburn's affect and swaying: his disability. Thus, all Dr. Labay really testified to was that taking a sleep aid is consistent with acting sleepy and probably caused the person to act sleepy if you have no other reason to believe that this person generally acts sleepy.

Appellant's Brief, at 15 (emphasis in original). Coburn's selective summary of Dr. Labay's testimony overlooks the fact that she specifically testified that: (1) "Zolpidem, **at this concentration**, is not compatible with the safe operation of a motor vehicle," N.T. Trial, 4/29/19, at 37-38 (emphasis added); (2) when she compared Coburn's symptoms to the relevant literature, Coburn exhibited symptoms that were "consistent with impairment from [Ambien]"

including cognitive slow-down, erratic driving, and swaying, *id.* at 39; and (3) she was aware that Coburn was claiming to have a leg disability, but that she discounted his behaviors attributable to his disability in forming her opinion, and that fact did not adversely affect her ability to form an opinion. *Id.*

In addition to Dr. Labay's expert testimony, the trial court received into evidence testimony from Trooper Henley and Corporal Meister, who recounted Coburn's behavior and signs of impairment at the time of his arrest. *Id.* at 7-25, 25-31. The court also received into evidence Coburn's prescription medication bottle for his Ambien. The warning on the label of the bottle states: "MAY CAUSE DROWSINESS. USE CARE WHEN OPERATING A VEHICLE, VESSEL, OR MACHINE." *See* Commonwealth's Exhibit C-3.

We find that the Commonwealth's evidence received by the trial court on the issue of causation is not in equipoise. *See In the Interest of J.B.*, *supra*. Doctor Labay's expert testimony, in combination with Trooper Henley's and Corporal Meister's testimony regarding Coburn's erratic driving and impairment, and the admission of the Ambien bottle label warning, are sufficient to prove the element of causation beyond a reasonable doubt. *See Tarrach*, *supra* at 346 (finding testimony of erratic driving, coupled with proof drugs were in defendant's system, sufficient to prove defendant's ability to drive safely was impaired beyond reasonable doubt, despite driver's claims that she failed field sobriety tests due to osteoarthritis in her knee, confusion after accident due to attention deficit disorder, and that she was sleep deprived because her father died shortly before accident). Consequently, all

elements of Coburn's DUI conviction were proven beyond a reasonable doubt; therefore, Coburn's sufficiency of the evidence claim fails.  **See Olsen**, **supra**.

Coburn's second claim on appeal is that the trial court erred when it excluded his testimonial evidence regarding his visit to a hospital several weeks after the instant arrest.  Our standard of review for challenges to the admissibility of evidence is well-settled:

> The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion.  An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias[,] or ill-will.

**Commonwealth v. Woodard**, 129 A.3d 480, 494 (Pa. 2015).

In its Rule 1925(a) opinion, the trial court explained why it excluded Coburn's proposed evidence:

> [Coburn claims] that the [c]ourt erroneously precluded [him] from introducing evidence of an alleged medical condition, unrelated to the Zolpidem found in his system, that was the true cause of his inability to safely operate his vehicle.  Having failed, however, to present supporting medical expert testimony, [Coburn's] claim is without merit.
>
> *        *        *
>
> "Relevance is the threshold for admissibility of evidence." **Commonwealth v. Tyson**, 119 A.3d 353, 358 (Pa. Super. [] 2015); **see also** Pa.R.E. 402.  "Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401; **see Tyson**, [**supra**] at 358 ("Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less

- 13 -

probable or supports a reasonable inference or presumption regarding a material fact.").

Here, defense counsel attempted to elicit testimony from [Coburn] about an alleged hospital visit that took place weeks after [his] arrest for the underlying charges. Defense counsel also inquired about [Coburn's] license being suspended shortly after these alleged visits. [Coburn] attempted to introduce[] this evidence to support the theory that [his] driving was impaired because of a medical condition, rather than the Zolpidem that was found in his system. [Coburn's] testimony alone[,][16] however, without testimony from a medical expert, would not establish as a matter of fact that he did indeed have a medical condition at the time of his arrest, or more importantly, that the medical condition was the cause of his impairment.[17] **See Lemon v. Commonwealth, Dept. of Tra[n]sp., Bureau of Driver Licensing**, 763 A.2d 534, 538 (Pa. Commw. [] 2000) (When a defendant who had his license suspended for refusing to submit to chemical testing under 75 Pa. C.S.[A.] § 1547(b)(1) suffers from a medical condition that allegedly affected his ability to perform the test, the defendant is required to present expert medical testimony supporting his claim if the medical condition is not obvious.)

[16] **See** [N.T. Trial, 4/29/19, at 6-7.] Neither prior to trial, nor in his opening statement, did [Coburn] indicate that he had a medical expert to support the credibility of these alleged facts.

[17] Although **Lemon** concerns 75 Pa.C.S.[A.] § 1547(b)(1), it is analogous to the case at hand in that both cases involve defendants who are claiming that a medical condition affected their ability to abide by the relevant statute. One would be hard[-]pressed to argue that the quantum of proof under [s]ection 3802(d)(2) for cases in which a defendant contends that a medical condition affected his ability to drive safely is less than that required in a chemical test refusal case.

Without supporting expert medical testimony, [Coburn's] testimony as to any alleged hospital visits or license suspensions that occurred after [his] arrest, is not relevant to the fact that [Coburn], at the time of his arrest, was impaired and unable to safely operate his vehicle. Chemical testing unequivocally established that [Coburn] had Zolpidem in his system one hour after [he] was apprehended, at levels that the Commonwealth's

medical expert opined rendered [him] incapable of safely driving a motor vehicle due to the drug's side-effects.

Trial Court Opinion, 8/8/19, at 9-11.

Here, the trial court excluded Coburn's proposed testimony on the grounds that it was not relevant and that the court could not assess the credibility of Coburn's proposed medical explanation without competent medical evidence provided by a qualified medical expert. We agree with the trial court that the quantum of proof is not reduced, under section 3802(d)(2), for cases in which a defendant contends that a medical condition affected his ability to drive safely, in comparison with other situations where medical testimony explains a defendant's inability to abide by a statute. *See* Trial Court Opinion, 8/8/19, at 10 n.17. *See also Wright v. DOT*, 788 A.2d 443, 445 (Pa. Commw. 2001) ("Where a licensee suffers from a medical condition that affects his or her ability to perform a test and that condition is not obvious, a finding that a licensee was unable to take the test for medical reasons must be supported by competent medical evidence."). Additionally, the events in Coburn's proposed evidence occurred weeks after his arrest. We agree with the trial court that Coburn failed to provide competent medical testimony establishing that his proposed medical evidence was either credible or relevant to his actions on the date of his arrest. We conclude, therefore, that the trial court did not abuse its discretion in excluding the testimony. *See Woodard*, *supra*.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/9/20