J-A11015-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THOMAS E. WILEY JR. | : | |
| | : | |
| Appellant | : | No. 856 MDA 2023 |

Appeal from the Judgment of Sentence Entered May 10, 2023
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0002914-2021

BEFORE:  BOWES, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY BOWES, J.:                    **FILED: SEPTEMBER 13, 2024**

Thomas E. Wiley Jr. appeals from the judgment of sentence of seven to fifteen years of incarceration imposed following his convictions for drug delivery resulting in death and criminal use of a communication facility.  We affirm.

The decaying corpse of Francis March ("Victim") was found in his apartment on the morning of June 25, 2019, by his girlfriend, Kimberly Bradley.  The autopsy indicated that Victim died from a drug overdose one or two days prior.  The following evidence linked Appellant to those drugs.

Ms. Bradley testified that she observed Victim texting Appellant during a cookout the couple attended on June 22, 2019.  After leaving the gathering, Ms. Bradley accompanied Victim to his apartment, arriving around 11:00 p.m., but left shortly thereafter when Victim stated that he "need[ed her] to go home[.]"  N.T. Trial, 2/6/23, at 96.  However, they continued to text each

other until sometime around midnight. That was the last time she saw Victim alive or had any communication with him.

On the morning of June 25, Victim's co-worker called Ms. Bradley informing her that Victim had not arrived for work that day. In response, Ms. Bradley drove to his apartment and used a key to open the locked door at approximately 8:30 a.m. Upon finding Victim's body on the kitchen floor, she immediately called 911. Officer Micheal Lyons was the first officer on scene and opined that Victim had been dead for some time based on the discoloration, bloat, and odor. He found no signs of foul play or forced entry. After taking photographs, he called Detective Matthew Shuey and the coroner to assist in the investigation. The authorities found suspected drugs in the kitchen.

Dr. Wayne Kenneth Ross performed an autopsy and testified at trial that Victim's body contained benzoylecgonine (a cocaine byproduct), fentanyl, and alcohol. He opined that the manner of death was accidental, and the cause of death was "complications of myocardial fibrosis and fentanyl/cocaine toxicity." *Id*. at 205. He concluded that while the combination of the two drugs would cause death, each drug would also independently cause death. Dr. Ross further concluded that Victim's body showed signs consistent with "a couple days" of decay before Ms. Bradley's discovery. *Id*. at 209.

The police linked Appellant to Victim after searching Victim's phone, which showed a history of Appellant arranging drug sales to Victim. The cellular phone data showed that Appellant and Victim had texted and called

- 2 -

each other on the evening of June 22 into the early morning hours of June 23, with the text messages discussing a meetup. Data from local cell phone towers established that Victim and Appellant were near a bar together, and that each man departed within approximately five to twenty minutes of each other. Shortly thereafter, both devices travelled back to their respective residences, where Victim's device remained until it was retrieved by the police. Victim made no more texts or calls to anyone after returning to his apartment.

Appellant agreed to an interview, in which he acknowledged that he regularly sold crack cocaine to Victim for at least two months before his death. However, he claimed that he did not sell drugs that were cut with fentanyl. Appellant did not admit to selling Victim cocaine between June 23 and June 25; however, when asked if he remembered meeting Victim in the early morning of June 24, Appellant responded, "I can tell you this much, whoever gave me them drugs wasn't my friend[.]" *Id*. at 459.[1]

Based on the foregoing, the Commonwealth charged Appellant with drug delivery resulting in death and criminal use of a communication facility. Following a trial, the jury convicted Appellant of both charges, and the court sentenced him as indicated hereinabove.

This timely appeal followed, and Appellant filed a court-ordered Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal. The

---

[1] The interview was played for the jury but not transcribed. The direct quotations come from the interrogating officer relaying specific parts of the interview in his testimony.

trial court authored a responsive Rule 1925(a) opinion. Appellant presents the following two issues for our review:

I. Was the evidence presented by the Commonwealth insufficient to prove beyond a reasonable doubt that [Appellant] committed the offense of drug delivery resulting in death where the Commonwealth failed to prove that drugs which [Appellant] delivered to [Victim], and which [Victim] ingested, caused [his] death?

II. Did the trial court err in overruling defense counsel's objection to the prosecutor's misleading statements that defense counsel knew that he could not "bring in the studies" regarding cocaine overdoses where these misleading statements encouraged the jury to conclude that defense counsel's argument regarding the forensic pathologist's testimony was false?

Appellant's brief at 8 (cleaned up).

Appellant's first claim challenges the sufficiency of the evidence for the conviction of drug delivery resulting in death. The following well-established principles govern this review:

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence.

***Commonwealth v. Williams***, 176 A.3d 298, 305-06 (Pa.Super. 2017) (cleaned up).

- 4 -

The Crimes Code defines the drug delivery resulting in death offense as follows:

A person commits a felony of the first degree if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of [§] 13(a)(14) or (30) of the act of April 14, 1972 (P.L.233, No.64), known as The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance.

18 Pa.C.S. § 2506(a). Accordingly, this offense "consists of two principal elements: (i) intentionally administering, delivering, giving, prescribing, selling, or distributing any controlled substance or counterfeit controlled substance, and (ii) death caused by the use of that drug." *Commonwealth v. Kakhankham*, 132 A.3d 991-92 (Pa.Super. 2015). The statute sets forth a "but-for" causation test. *Id*. at 993. The Crimes Code expounds that conduct is the cause of a result when "it is an antecedent but for which the result in question would not have occurred[.]" 18 Pa.C.S. § 303(a)(1).

Appellant's overarching assertion is that the Commonwealth failed to establish causation. That argument is premised on two related points. The first is that Victim died from a combination of cocaine and fentanyl as opposed to cocaine by itself. Appellant cites self-serving statements from his recorded interview, wherein he informed the authorities that while he sold cocaine to Victim, "he never cut the cocaine with anything else, and that he had used the same drugs that [Victim] used, so he could not believe that these drugs ha[d] caused his death." Appellant's brief at 21. Accordingly, Appellant does not

address Dr. Ross's testimony that cocaine alone sufficed to kill Victim. *Id*. at 22 ("There simply was no evidence that the cocaine/fentanyl mixture which killed [Victim] came from [Appellant].").

Second, Appellant generally suggests that Victim could have died from ingesting drugs that came from someone other than Appellant. He argues that Victim could have obtained the drugs at some point in the day on June 22 when he was not with Ms. Bradley, as her testimony indicated that she and Victim traveled in separate cars to Victim's apartment, and Victim arrived five or minutes after her. He additionally notes that numerous bags of drugs were found in Victim's kitchen, some of which were empty, and that the bags were made of different types of plastics, which, in his view, tends to show that they came from multiple dealers. *Id*. at 20. Moreover, while Appellant's fingerprints were found on one of the bags in the kitchen, he notes that it was not drug tested. Thus, the evidence does not indicate what was in that specific bag.

The following provides context for addressing Appellant's claim. Recall that Victim's body was found in his apartment's kitchen. Loose on the kitchen table officers recovered suspected drugs, which were collected and tested positive for a mix of cocaine and fentanyl. *See* N.T. Trial, 2/7/23, at 356 (stipulation to report indicating that "off-white loose chunky substance located on a table . . . contained cocaine base and fentanyl."). As to other specifics of what was found in the kitchen, the affiant, Detective Shuey, testified that

some of the evidence had moved during processing due to a draft, as related

in the following testimony:

> Initially, the room looked very similar to the photographs. However, the only difference that I can see was that the plastic baggies that were collected were initially on top of the table, the kitchen table, on -- one baggie was on top of the white chunky substance later identified as the crack cocaine and fentanyl mix. And another plastic baggie was immediately beside that on the table.
>
> Due to the opening of the door, it created a wind tunnel, and those baggies subsequently blew off of the table and were located where they are represented on the photographs now.

*Id*. at 341.  Later, on cross-examination, the detective agreed that three

baggies were on the table originally, with one falling into Victim's bodily fluids,

a second falling next to his foot, and a third "would have been on the floor in

the kitchen.  I believe . . . underneath the chair."  *Id*. at 413.  As noted, the

cocaine-fentanyl mixture was loose on the table and not contained in any bag.

*Id*. at 415.  Appellant's fingerprint was discovered on the bag located

"between [Victim's] legs that was originally on the table[.]"  *Id*.  That bag was

not tested for any kind of drug residue, as Detective Shuey explained "[his]

understanding from the laboratory, the Pennsylvania State Police, is you can

only test for one thing."  *Id*.  Thus, testing that bag for fingerprints precluded

the lab from testing for any residue.  The lab tested the bag under the kitchen

chair for prints, with negative results.  Since the laboratory could only test for

prints **or** residue, this bag was not tested for drugs.[2]   Finally, officers recovered from the vicinity of Victim's body a lighter, a metal pipe, and a tube, which officers testified are paraphernalia commonly used to ingest crack cocaine.

In rejecting Appellant's sufficiency challenge, the trial court summarized the evidence establishing guilt:

> Here, the evidence presented by the Commonwealth at trial demonstrated that there were text messages and phone calls between [Victim]'s cell phone and Appellant's cell phone on June 22, 2019.  The cell tower location data showed that at around 12:36 [a.m. on June 23,] [Victim]'s device and Appellant's device were traveling near the same location, River House Bar & Grill, and within between five and twenty minutes, both devices then travel[ed] away from that location back to their respective addresses.  Drug paraphernalia found at [Victim]'s apartment included cut baggies, a lighter, a pipe, and cocaine, and showed that [Victim] had ingested, or was in the process of ingesting, the drugs immediately prior to his death.  Detective Matthew Shuey interviewed Appellant on December 19, 2019.  During the interview Appellant acknowledged that he has sold drugs to [Victim] on more than one occasion.  At no point during the interview did Appellant deny delivering drugs to [Victim] at the River House Bar & Grill prior to his death.  Finally, Dr. Ross'[s] expert testimony concluded that [Victim's] cause of death was "complications of myocardial fibrosis and fentanyl/cocaine toxicity."

Trial Court Opinion, 8/7/23, at 10-11 (citations omitted).

Upon our review of the trial evidence, we agree that the Commonwealth presented sufficient evidence to support the conviction of drug delivery

---

[2] The remaining bag could not be tested, due to contamination from Victim's bodily fluids around his decaying body.

resulting in death and specifically, that the drugs Appellant delivered caused Victim's death.

Initially, Appellant has not offered any argument challenging whether the Commonwealth established that he delivered or sold drugs to Victim. He essentially concedes that the evidence sufficed to show that Appellant sold Victim cocaine. *See* Appellant's brief at 21 ("[Appellant] admitted that he had sold cocaine to [Victim] in corner bags, and the evidence suggests he may have sold cocaine to [Victim] on the night he died[.]"). Appellant's fundamental point is that the Commonwealth had to establish that Appellant delivered cocaine laced with fentanyl, not just cocaine.

We disagree, as there is no factual or legal support for the notion that Appellant's conviction required proof of fentanyl delivery. The expert's testimony was clear that cocaine alone was sufficient to cause death. Dr. Ross related his "conclusion . . . that the cocaine had a direct cardiotoxic effect on [Victim]'s heart and . . . led to his death." N.T. Trial, 2/6/23, at 194. The doctor stated that the level of cocaine byproduct in Victim's system was fifty-one nanograms per milliliter. When asked, "Does [just] the cocaine kill him in this case," he replied "Yes." *Id*. at 207. Thus, the evidence was sufficient to establish that Appellant delivered cocaine to Victim, and that said cocaine killed him. That fentanyl, or the combination of fentanyl and cocaine, would also cause Victim's death does not detract from this conclusion. *See* ***Commonwealth v. Proctor***, 156 A.3d 261, 271 (Pa.Super. 2017) (affirming causation of death for the same crime; "a defendant's conduct need not be

the only cause of the victim's death in order to establish a causal connection . . . even though other factors combined with that conduct to achieve the result") (cleaned up).

Having concluded that the sale of a drug which resulted in Victim's death is itself sufficient, we tackle Appellant's remaining argument that someone else may have supplied Victim with the drugs that killed him.[3] He claims that any conclusion Appellant delivered the drugs which ended up killing Victim "was mere speculation." Appellant's brief at 22. This argument evokes the "equipoise principle," in which evidence is insufficient if it is "so unreliable or contradictory that it is insufficient as a matter of law to convict. In such circumstances, the Commonwealth does not meet its burden of proof beyond a reasonable doubt, because the evidence and all reasonable inferences rise no further than mere suspicion or conjecture." *In Interest of J.B.*, 189 A.3d 390, 415 n.26 (Pa. 2018).

We disagree that the verdict here rests on pure conjecture or speculation. The Commonwealth "may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence," *Commonwealth v. Richard*, 150 A.3d 504, 516 (Pa.Super. 2016) (citation omitted), provided that "the combination of the

_____

[3] While Appellant concedes that the evidence sufficed to warrant an inference that he sold Victim cocaine on June 23, his argument here is that it requires conjecture to conclude that those were the same drugs which led to Victim's death.

evidence links the accused to the crime beyond a reasonable doubt." ***Commonwealth v. Hardcastle***, 546 A.2d 1101, 1105 (Pa. 1988).

The evidence linking Appellant to the drugs causing Victim's death is largely circumstantial, but not entirely so. Appellant's fingerprints were present on a bag located in the room where Victim died. Since the Commonwealth did not test the residue inside that bag, Appellant is correct that we cannot say for certain that it contained drugs. The Commonwealth, however, "need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." ***Commonwealth v. Sebolka***, 205 A.3d 329, 337 (Pa.Super. 2019) (quotation marks and citation omitted). Taken together, the combination of circumstantial and direct evidence, as aptly set forth by the trial court opinion, suffices to establish Appellant's guilt. We agree with the court that the circumstantial evidence, when paired with the fingerprint evidence, justifies the inference that Appellant delivered the drugs that killed Victim during the early morning hours of June 24, which Victim then smoked, leading to his death. The jury could rationally conclude that Victim purchased drugs from Appellant because he had no other drugs immediately available.

Moreover, the metal pipe, which contained cocaine-fentanyl residue, was located right by Victim's body, again suggesting that the nearby baggies were the source of the fatal drugs. As previously discussed, the evidence is

- 11 -

sufficient to show that Appellant delivered cocaine to the Victim. Our "standard of review follows the United States Supreme Court's approach as articulated by **Jackson v. Virginia**, 443 U.S. 307 (1979)[.]" **Commonwealth v. Holt**, 273 A.3d 514, 528 (Pa. 2022). "**Jackson** leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts." **Coleman v. Johnson**, 566 U.S. 650, 655 (2012) (quotation marks and citation omitted). The chain of inferences we have established all reasonably flow from the basic fact that Appellant's fingerprint was on one of the baggies. Appellant's sufficiency challenge therefore fails.

We now address Appellant's second claim, which concerns the trial court's handling of his objections to a statement during the Commonwealth's closing argument, which itself was in response to Appellant's closing.

We briefly discuss the relevant background concerning the competing remarks. The Commonwealth's expert witness testified that Victim had three substances in his blood: alcohol, fentanyl, and benzoylecgonine. Dr. Ross opined that the cocaine by itself would cause Appellant's death. He explained that Victim's blood contained benzoylecgonine, "a breakdown product" of cocaine, meaning cocaine "was originally ingested and went through the system and . . . through the liver . . . was broken down into benzoylecgonine." N.T. Trial, 2/6/23, at 192. The doctor stated that the level of benzoylecgonine in Victim's system was fifty-one nanograms per milliliter.

On cross-examination, Appellant established that fifty nanograms is the cutoff for reported levels, *i.e.*, if Victim had forty-nine nanograms per milliliter it would not be reported on the lab result. Additionally, Dr. Ross agreed that the average level of benzoylecgonine in cocaine-related fatalities was around 7,900 nanograms per milliliter. The following exchange then occurred:

> Q. Okay. And they also go on to give other examples regarding this. Of people that – impaired drivers with benzo. They have 1,260 nanograms per milliliter as being impaired levels; correct?
>
> A. That's what it says.
>
> Q. And 51 is certainly significantly less than that; correct?
>
> A. Right. But I have literature that will tell you that you can have levels as low as 40 nanograms per ML of the drug in the system and it's enough to kill you.

*Id*. at 217.

During his closing argument, Appellant asked the jury to consider whether scientific literature supported the testimony that a level as low as forty nanograms per milliliter is sufficient to cause death. Appellant argued that if this assertion was scientifically sound then those studies would have been admitted into evidence:

> You know he didn't bring it in. And you know if he had it, he would have brought it. There is no study, I suggest to you, that has 51 compared to 7,900 and say that's his cause of death. That's just ludicrous. Your common sense tells you that's just nonsense. They are trying to make this cocaine be the cause of death when we all know it's the fentanyl. The doctor tried to pull the wool over your eyes, and his own paperwork tells you that that's nonsense.

N.T. Trial, 2/8/23, at 489-90.

- 13 -

The Commonwealth, during its closing, responded to this argument by suggesting the Commonwealth would have been barred from introducing the actual studies into evidence, stating: "[C]ounsel knows, by the way, I cannot actually bring in the studies. There's a hearsay exception, learned treatise. He knows I know that. I can't bring in Grey's Anatomy to you and read it[.]" *Id*. at 515. Appellant objected, protesting that an "objection that you can't bring in studies because they're hearsay . . . is total nonsense. He's an expert. He can use every study. You and I know that perfectly clear. He can bring in [fifty] studies." *Id*. at 533-34. The judge asked counsel to hold objections until the closing was complete. At that point, Appellant again raised his objection, but he did not request a curative instruction, a mistrial, or any other kind of relief.[4]

Appellant presently contends that the trial court should have issued a curative instruction. He styles this issue as one of prosecutorial misconduct, claiming that the prosecutor's response suggested to the jury that Appellant was attempting to deceive them.

The bulk of Appellant's argument, however, addresses whether Dr. Ross would have been permitted to bring in the relevant studies.

_____

[4] After the jury was charged, the trial court called the parties to sidebar, asking "Anything further?" N.T. Trial, 2/8/23, at 549. Appellant stated, "Expert witness?" *Id*. The trial court stated it had "done that during the course of the trial" but agreed to give the instruction. *Id*. There is no indication that this request had anything to do with the earlier, overruled objection.

It is clear that defense counsel was within the bounds of Pennsylvania's Rules of Evidence when he challenged Dr. Ross's failure to identify the studies upon which he relied in claiming that [fifty-one] nanograms of cocaine was a fatal dose. In fact, under Rule 705, Dr. Ross was required to cite the basis for this opinion. It is equally clear that the prosecutor was attempting to lead the jury to a conclusion which was false, when he suggested that defense counsel knew that he could not bring in the studies which Dr. Ross referenced when Dr. Ross was, as an expert witness, permitted to cite and describe the studies upon which he relied. A prosecutor may not accuse defense counsel of using a smokescreen or otherwise trying to confuse the jury.

*Id*. at 27-28. In short, the success of Appellant's prosecutorial misconduct claim depends on our agreement that Dr. Ross could have brought the studies with him to court.

We conclude that Appellant's argument is waived for two reasons. First, our review of the trial transcript confirms the trial court's finding that Appellant did not ask for a curative instruction or any other form of relief. **See** Trial Court Opinion, 8/27/23, at 12-13 ("[E]ven though defense counsel did not request a curative instruction on the matter, the [c]ourt sufficiently instructed the jury on expert testimony[.]").

Second, Appellant's argument has nothing to do with prosecutorial misconduct. Instead, the parties simply have a common dispute about an evidentiary issue.[5] As previously quoted, his argument focuses on Rule 705, which states "If an expert states an opinion the expert must state the facts or data on which the opinion is based." Pa.R.E. 705. Appellant may or may not

_____

[5] The trial court's opinion expresses its continuing belief that "[t]the Commonwealth's statement was correct." Trial Court Opinion, 8/27/23, at 13.

- 15 -

be correct that Dr. Ross's testimony ran afoul of this rule; however, that point is simply irrelevant by the time closing argument occurred.

Appellant's assertion that counsel "challenged Dr. Ross'[s] failure . . . under Rule 705" during closing argument is illogical.  A legal argument that Dr. Ross's opinion should have been discounted as a matter of law obviously cannot be raised during closing argument.  If Appellant wished to object to Dr. Ross's failure to disclose the basis of his opinion under that Rule, then the proper time to raise that point was during his testimony.  **See Commonwealth v. Elliott**, 80 A.3d 415, 436 (Pa. 2013) (observing that "an objection grounded on Pa.R.E. 705 would have been futile" due to medical examiner's testimony explaining the basis for her opinion); **Commonwealth v. Brown**, 185 A.3d 316, 332 (Pa. 2018) (concluding that challenge to expert testimony was not raised at trial pursuant to Rule 703 and was therefore waived).[6]  Appellant could have squarely raised that legal argument by asking Dr. Ross if he had brought the studies.  That objection would have resulted in a trial court ruling, setting the stage for the closing arguments at issue here. By failing to raise any challenge to the admissibility or reliability of Dr. Ross's opinion during his testimony, Appellant waived that issue.  **See** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").  In turn, we decline to permit Appellant to raise

---

[6] Rule 703 is closely related to Rule 705 and states as follows:  "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."

- 16 -

an evidentiary challenge by laundering it through a prosecutorial misconduct claim.

Having found no merit in either of Appellant's two claims, we have no basis to disturb his convictions.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/13/2024